**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| PAUL GREGORY BARROWS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ORACLE CORPORATION, LAWRENCE J. ELLISON, SAFRA A. CATZ, CLAYTON MAGOUYRK, MICHAEL SICILIA, DOUGLAS KEHRING, and MARIA SMITH,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

Plaintiff Paul Gregory Barrows ("Plaintiff"), by and through Plaintiff's counsel, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Oracle Corporation ("Oracle" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.    **NATURE OF THE ACTION AND OVERVIEW**

1.    This is a federal securities class action on behalf of a class of all persons and entities who purchased or otherwise acquired Oracle common stock between June 12, 2025, and December

16, 2025, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, promulgated thereunder.

2.     Oracle, a Delaware corporation with its principal executive offices in Austin, Texas, is a technology company that provides, among other things, infrastructure for operating artificial intelligence ("AI") programs. Oracle's common stock trades on the New York Stock Exchange under the ticker symbol "ORCL."

3.     During the Class Period, Defendants misled investors by touting the Company's contracts to develop data center capabilities for AI infrastructure and falsely assuring investors that the Company's significant capital expenditures ("CapEx") would quickly result in accelerated revenue growth. For example, Defendants assured investors that the Company's substantially increased spending on AI infrastructure—including for data centers used by OpenAI, the operator of ChatGPT—would rapidly convert into "accelerating revenue and profit growth" and that "we have a very good line-of-sight for our capabilities to . . . just spend on that CapEx right before it starts generating revenue."

4.     However, on September 24, 2025, S&P Global Ratings ("S&P") warned that OpenAI "could account for more than a third of total Oracle revenues by fiscal 2028 and even a greater share by fiscal 2030," creating risks given that "OpenAI's ability to meet contractual obligations will be contingent on AI tailwinds continuing and its models being a market leader to continue to raise external financing."

5.     On this news, the price of Oracle common stock declined $5.37 per share, or nearly 2%, from a close of $313.83 per share on September 23, 2025, to close at $308.46 per share on September 24, 2025.

6.    The following day, on September 25, 2025, analysts at Rothschild & Co. Redburn ("Rothschild") initiated coverage of Oracle at "Sell," stating that the market was "materially overestimat[ing]" future growth resulting from Oracle's AI deals.  More specifically, Rothschild warned that the Company's promises of massive new revenues from its increased AI infrastructure business were "***unlikely to materialize***" and set a $175 price target for Oracle—representing a 40% pullback in the Company's stock.

7.    In response to this news, the price of Oracle common stock declined an additional $17.13 per share, or more than 5.5%, from a close of $308.46 per share on September 24, 2025, to close at $291.33 per share on September 25, 2025.

8.    After the market closed on December 10, 2025, Oracle announced its financial results for the second quarter of fiscal year 2026, including revenue growth below analysts' consensus estimate, quarterly CapEx well above analysts' estimates, and negative free cash flow of more than $10 billion.  During the accompanying earnings call, Defendant Douglas Kehring (the Company's Principal Financial Officer) revealed that the Company now projected $50 billion of CapEx in fiscal year 2026—$15 billion more than the Company's previous projection in September 2025 and as much as $25 billion more than the Company's projection in June 2025. Notably, despite projecting substantially increased spending, the Company did not increase its guidance for 2026 revenue, and increased its guidance for 2027 revenues by only $4 billion.

9.    In response to an analyst's question about how much money Oracle needs "to raise to fund its AI growth plans ahead," Defendant Clayton Magouyrk (the Company's new Co-Chief Executive Officer) further stoked concerns by failing to provide a specific number and revealing only that the Company expected to spend "less" than $100 billion—suggesting that Oracle may require a massive amount of capital funding through equity raises or additional debt.

10.     As *Bloomberg* and other media outlets reported that evening, the cost of protecting the Company's debt against default for five years—a notable measure of Oracle's credit risk—reached its highest level since April 2009.  An AllianceBernstein analyst explained, "Oracle really matters because it is harbinger of the AI capex boom," and "[t]his repricing in debt markets is very consistent with the view that risks are building."

11.     On this news, the price of Oracle common stock declined $24.16 per share, or nearly 11%, from a close of $223.01 per share on December 10, 2025, to close at $198.85 per share on December 11, 2025.

12.     After the market closed on December 11, 2025, Oracle filed its quarterly financial report on Form 10-Q with the SEC, which revealed that the Company had "$248 billion of additional lease commitments, substantially all related to data centers and cloud capacity arrangements, that are generally expected to commence between the third quarter of fiscal 2026 and fiscal 2028 and for terms of fifteen to nineteen years that were not reflected on our condensed consolidated balance sheets as of November 30, 2025."  Analysts at CreditSights later labeled this revelation a "bombshell disclosure," noting that the Company's lease commitments had increased massively from the prior quarter, when the Company had reported just under $100 billion in lease commitments.  As *Bloomberg* reported, "Oracle's future lease exposure far exceeds similar commitments by peers," with "a mismatch between the long duration of the property leases and much shorter contracts with key customers such as OpenAI."

13.     On December 12, 2025, *Bloomberg* further reported that Oracle had "pushed back the completion dates for some of the data centers it's developing for the artificial intelligence model developer OpenAI to 2028 from 2027" due to "labor and material shortages"—suggesting

that Oracle's promised revenue growth resulting from its increased spending may be further delayed, if it arrives at all.

14.     In response to these revelations, the price of Oracle common stock declined $8.88 per share, or approximately 4.5%, from a close of $198.85 per share on December 11, 2025, to close at $189.97 per share on December 12, 2025.

15.     On December 17, 2025, *Financial Times* reported that Blue Owl Capital—"the primary [financial] backer for Oracle's largest data centre projects in the US"—had backed out of funding a $10 billion Oracle data center intended to serve OpenAI.  According to the report, Blue Owl pulled out of the deal as a result of concerns about Oracle's spending commitments and rising debt levels.

16.     On this news, the price of Oracle common stock declined $10.19 per share, or approximately 5.4%, from a close of $188.65 per share on December 16, 2025, to close at $178.46 per share on December 17, 2025.

17.     This Complaint alleges that, throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants misrepresented and/or failed to disclose that: (1) the Company's AI infrastructure strategy would result in massive increases in CapEx without equivalent, near-term growth in revenue; (2) the Company's substantially increased spending created serious risks involving Oracle's debt and credit rating, free cash flow, and ability to fund its projects, among other concerns; and (3) as a result, Defendants' representations about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

18.     As a result of Defendants' wrongful acts and omissions, and the significant declines in the market value of the Company's common stock pursuant to the revelation of the fraud, Plaintiff and other members of the Class (defined below) have suffered significant damages.

## II.     JURISDICTION AND VENUE

19.     Plaintiff's claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Oracle is incorporated in this District.

22.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

23.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Oracle common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

24.     Defendant Oracle is a Delaware corporation headquartered at 2300 Oracle Way, Austin, Texas, 78741.

25.     Defendant Lawrence J. Ellison is the Company's Executive Chairman and Chief Technology Officer.

26.     Defendant Safra A. Catz was the Company's Chief Executive Officer until September 22, 2025, and has served as the Company's Executive Vice Chair since September 22, 2025.

27.     Defendant Clayton Magouyrk has served as the Company's Co-Chief Executive Officer since September 22, 2025.

28.     Defendant Michael Sicilia has served as the Company's Co-Chief Executive Officer since September 22, 2025.

29.     Defendant Douglas Kehring has served as the Company's Principal Financial Officer since September 22, 2025.

30.     Defendant Maria Smith is the Company's Executive Vice President and Chief Accounting Officer.

31.     Defendants Ellison, Catz, Magouyrk, Sicilia, Kehring, and Smith are collectively referred to herein as the "Individual Defendants."

32.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

33.     Oracle and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.     Background

34.     Oracle is a Delaware corporation with its principal executive offices in Austin, Texas.  Oracle offers technology products and services that include database software, enterprise applications (such as programs that support customer relationship management and supply chain management), and cloud infrastructure and hardware, including infrastructure for operating AI programs.

35.     Oracle's common stock trades on the New York Stock Exchange under the ticker symbol "ORCL."

### B.     Defendants' False and Misleading Statements

36.     The Class Period begins on June 12, 2025, to coincide with the Company's announcement of its fourth quarter fiscal year 2025 financial results after the market closed on June 11, 2025.  In a press release, Defendants touted strong revenue growth and promised more to come, with Defendant Catz stating:

> FY25 was a very good year—but we believe ***FY26 will be even better as our revenue growth rates will be dramatically higher***. . . . We expect our total cloud growth rate—applications plus infrastructure—will increase from 24% in FY25 to over 40% in FY26.  Cloud Infrastructure growth rate is expected to increase from 50% in FY25 to over 70% in FY26.  And RPO is likely to grow more than 100% in FY26.  Oracle is well on its way to being not only the world's largest cloud application company—but also one of the world's largest cloud infrastructure companies.

37.     Similarly, Defendant Ellison stated:

> Overall Oracle Cloud Infrastructure ["OCI"] consumption revenue grew 62% in Q4.  ***We expect OCI consumption revenue to grow***

*even faster in FY26. OCI revenue growth rates are skyrocketing—*
*so is demand*.

38.     During the accompanying earnings call held on June 11, 2025, Defendants continued to assure investors that the Company's growing commitment to AI would produce strong revenues, with Defendant Catz representing that "OCI has seen exceptional demand for infrastructure services, and those contracted non-cancelable bookings in RPO"—including the "Oracle autonomous database and the AI data platform"—gave Defendants "confidence that OCI revenue will grow over 70% this current year."  Defendant Catz further stated that "what is clear is that more customers will use the Oracle database to leverage AI," and explained that "as a result of the strength in our cloud applications and infrastructure," the Company was "raising [its] revenue guidance for fiscal year '26 to over $67 billion, up 16% for the year."

39.     Additionally, Defendant Catz represented that "[t]he vast majority of our CapEx investments are for revenue-generating equipment that is going into data centers," projected that CapEx for fiscal year 2026 would be "***over $25 billion as we work to meet demand from our backlog***," and again assured investors that, "***[a]s we bring more capacity online, our revenue and profit growth will further accelerate***."

40.     Defendant Ellison similarly promised that "Oracle's future is bright in this new era of cloud computing," as "Oracle will be the number one builder and operator of cloud infrastructure data centers," and further stated:

> No other company is even attempting to build the depth and breadth of AI-based application that we have already built.  Oracle will build more cloud infrastructure data centers than all of our infrastructure competitors combined.  All of our OCI data centers from the smallest low-cost data center to the largest gigawatt AI training data center, include all Oracle OCI capabilities.  A large percentage of those capabilities are autonomous, so labor costs are minimized and human error is dramatically reduced.  Oracle is ***already prospering***

9

in this new era of cloud computing and AI, and ***it's just the beginning***.

41.     Defendant Ellison further represented that, "[a]s use of AI increases, so will Oracle's database market share" and that "Oracle will be the largest and most profitable cloud applications company in the world."  Additionally, in response to an analyst's question about the future of Oracle's "Stargate" project—a massive deal to build new AI infrastructure for OpenAI—and its contribution to the Company's projected growth rate, Defendant Ellison stated that "[w]e're seeing huge growth in multi-cloud from the data centers we've already built" and that "the [future] growth rate in multi-cloud is astonishing."

42.     In response to an analyst's question about how CapEx was "helping you yield more revenue" and "how do you know [$25 billion] is the right number for this year," Defendant Catz stated:

> The reality is that, as I mentioned on the call, our CapEx is usually about equipment.  We're not a—we have building partners who charge us rent once they've finished constructing things.  And when we all of a sudden have higher CapEx, it means we are filling out data centers and we are buying components to build our computers, which are different than other people's, and we are putting them on the floor.
>
> We had an opportunity to buy up for deployment.  And so we did, and we are putting out as much capacity as we possibly can as quickly as we can. I do believe that the $25 billion next year may turn out to be understated.  ***So it is all to meet demand***.  We don't order.  We don't build unless we've got orders for our capacity to be built out.  ***And we have so much in orders right now that I actually expect—I believe I said on the call over $25 billion this next quarter, and that is again to match demand***.

43.     Defendant Ellison added:

> The demand is astronomical.  Now we have to—but we have to do this methodically.  The reason demand continues to outstrip supply is we can only build these data centers—build these computers so fast.  And we're also doing a lot of engineering around high-speed networking.     You'll see us making—we are making large

10

engineering investments to speed up the networking, the reliability of the networking, and lower the cost of the networking. So we're doing a bunch of things—we are doing a bunch of things to lower our CapEx costs. But even if we do that, **CapEx is going to go up because the demand right now seems almost insatiable**. I mean, I don't know how to describe it. I've never seen anything remotely like this.

44.     Despite Defendants' assurances that Oracle's increased spending was necessary to meet demand and would result in higher revenues, concerns about the effects of the Company's expenditures began to grow.

45.     For example, on July 2, 2025, S&P revised its outlook for Oracle from "stable" to "negative," warning that "[t]he negative outlook reflects our expectation for Oracle's cash flow profile to remain weak for at least the next two years as it continues to build out its cloud infrastructure business," as well as "our uncertainty about the magnitude of future capital spending given its fiscal 2025 spending far exceeded our initial expectations and the impact on our credit metrics if the company needs to fund rising capital spending with new debt issuances." S&P further stated that "[w]e are also uncertain as to Oracle's competitive advantage as AI workloads move from training to inferencing," and that "Oracle competes with much larger hyperscalers including Microsoft Inc.'s Azure, Amazon.com Inc.'s AWS, and Alphabet Inc.'s Google Cloud, all of which have greater financial flexibility to outspend Oracle and weather potential downturns."

46.     Similarly, on July 28, 2025, Moody's Ratings ("Moody's") revised its outlook for Oracle from "stable" to "negative," stating that "[t]he change in outlook reflects the expectation of continuing elevated leverage and increasingly negative free cash flow as Oracle materially ramps up its AI infrastructure business." A Senior Credit Officer at Moody's further suggested that "capital expenditure requirements will likely also drive significant negative free cash flow and liability growth as the AI business builds out," while Moody's also warned that "[t]he cash flow

shortfall is further exacerbated by Oracle's very large existing debt obligations, meaningful dividend payments and core cloud business expenditures."  Moody's also noted that "[w]hile multiple other hyperscale providers are building out AI infrastructure, none are as leveraged or cash flow negative as Oracle entering into this phase."

47.     Nonetheless, Defendants continued to commit to enormous new spending and assure investors that the Company's increasing CapEx would pay off in the form of increased, near-term revenues.  For example, in a press release announcing the Company's first quarter 2026 financial results on September 9, 2025, Defendant Catz touted massive growth in the Company's RPO and revenues, particularly with respect to OCI:

> We signed four multi-billion-dollar contracts with three different customers in Q1. . . .  This resulted in RPO contract backlog increasing 359% to $455 billion.  It was an astonishing quarter— and ***demand for Oracle Cloud Infrastructure continues to build***. Over the next few months, we expect to sign-up several additional multi-billion-dollar customers and RPO is likely to exceed half-a-trillion dollars.  The scale of our recent RPO growth enables us to make a large upward revision to the Cloud Infrastructure portion of Oracle's overall financial plan which we will be presenting in detail next month at the Financial Analyst Meeting.  As a bit of a preview, ***we expect Oracle Cloud Infrastructure revenue to grow 77% to $18 billion this fiscal year—and then increase to $32 billion, $73 billion, $114 billion, and $144 billion over the subsequent four years***.  Most of the revenue in this 5-year forecast is already booked in our reported RPO.  Oracle is off to a brilliant start to FY26.

48.     Likewise, Defendant Ellison represented that additional investments in AI infrastructure would accelerate the Company's growth, stating that Defendants expected "MultiCloud revenue to grow substantially every quarter for several years as we deliver another 37 datacenters to our three Hyperscaler partners, for a total of 71."

49.     During the accompanying earnings call that same day, Defendants continued to tout the benefits of Oracle's additional spending on AI infrastructure, with Defendant Catz stating that

"Oracle has become the go-to place for AI workloads."  Defendant Catz also revealed that "*I now expect fiscal year '26 CapEx will be around $35 billion*," but assured investors that "the vast majority of our CapEx investments are for revenue-generating equipment that is going into the datacenters and not for land or buildings," and that "*[a]s we bring more capacity online, we will convert the large RPO backlog into accelerating revenue and profit growth*."  Likewise, Defendant Catz stated that "[b]eyond fiscal year '26, I'm even more confident in our ability to further accelerate our top and bottom-line growth rate."

50.     Moreover, in response to an analyst who noted that the growth in RPO would "require a lot of infrastructure buildout" and asked "how much CapEx and operational cost structure will be needed to fully service these contracts" and "generally how investors should be thinking about the ROI on this spend," Defendant Catz represented that Oracle's increased spending would result in increased revenues right away, stating:

> So, first of all, as I mentioned in the prepared remarks, and as I've said very clearly beforehand, we do not own the property.  We do not own the buildings.  What we do own and what we engineer is the equipment, and that's equipment that is optimized for the Oracle Cloud.  It has extremely special networking capabilities.  It has technical capabilities from Larry and his team that allows us to run these workloads much, much faster.  And as a result, it's much cheaper than our competitors, and depending on the workload. Now, because of that, *what we do is we put in that equipment only when it's time and usually very quickly, assuming that our customer accepts it, we're already generating revenue right away*. The faster they accept the system and that it meets their needs, faster they start using it, the sooner we have revenue.  This is in some ways, I don't want to call it asset-light from the finance world, but it's asset-pretty-light, and that is really an advantage for us.
>
> I know some of our competitors, they like to own buildings.  That's not really our specialty.  Our specialty is the unique technology, the unique networking, the storage, just the whole way we put these systems together.  And by the way, they are identical and very simplified, and again, making it possible for us to be very profitable while still being able to offer our customers an incredibly compelling price.  What I have indicated is that CapEx looks like

it's going to be about $35 billion for this fiscal year, but because we're monitoring this, ***we're literally putting it in right when we take possession and then handing it over to generate revenue right away***.

So, ***we have a very good line-of-sight for our capabilities to put this out and to—and basically to just spend on that CapEx right before it starts generating revenue***. But at this point, I'm looking at $35 billion for the year, and I think, I mean, it could be a little higher, but I think—and if it is higher, it's good news because it means more capacity has been handed over to me in terms of floor space. And as you also know, we are embedded in our competitors' clouds. Again, all we are responsible for to pay for is, in fact, our equipment. And that goes right away. And there, we're moving ultimately to 71 datacenters embedded in our competitors or/partners.

51. Defendant Ellison also reiterated that "demand is going to be insatiable" for Oracle's AI cloud offerings and that "we can deliver a lot of databases and a lot of AI across our cloud over the next several years."

52. The above statements identified in paragraphs 36-51 were materially false and misleading and failed to disclose materially adverse facts about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose that: (1) the Company's AI infrastructure strategy would result in massive increases in CapEx without equivalent, near-term growth in revenue; (2) the Company's substantially increased spending created serious risks involving Oracle's debt and credit rating, free cash flow, and ability to fund its projects, among other concerns; and (3) as a result, Defendants' representations about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

### C.    The Truth Begins to Emerge

53. Investors began to learn the truth about the risks associated with the Company's increased CapEx and new investments in AI on September 24, 2025, when S&P reiterated its newly negative outlook for Oracle's credit rating, citing concerns about the growing risks resulting

from Oracle's spending strategy and increasing reliance on OpenAI (which had recently agreed to purchase $300 billion in computing power from Oracle over approximately five years). Specifically, S&P warned that "OpenAI could account for more than a third of total Oracle revenues by fiscal 2028 and even a greater share by fiscal 2030," creating risks because "OpenAI's ability to meet contractual obligations will be contingent on AI tailwinds continuing and its models being a market leader to continue to raise external financing."

54.     On this news, the price of Oracle common stock declined $5.37 per share, or nearly 2%, from a close of $313.83 per share on September 23, 2025, to close at $308.46 per share on September 24, 2025.

55.     The next day, on September 25, 2025, media outlets reported that Rothschild had initiated coverage of Oracle at "Sell" and set a $175 price target for Oracle—representing a 40% pullback in Oracle's stock.   Specifically, Rothschild warned that the market "***materially overestimates the value of Oracle's contracted cloud revenues***" and that the Company's sky-high projections of AI-driven revenues represented a "risky blue-sky scenario that is ***unlikely to materialize***."   Rothschild further characterized Oracle's position as "closer to that of a financier than a cloud provider."

56.     In response to this news, the price of Oracle common stock declined an additional $17.13 per share, or more than 5.5%, from a close of $308.46 per share on September 24, 2025, to close at $291.33 per share on September 25, 2025.

57.     Then, on September 29, 2025, *The Wall Street Journal* reported that "[t]o make good on its end of the [$300 billion] contract" with OpenAI, "Oracle has to spend on that infrastructure before it gets paid in full by OpenAI—***which means a lot of borrowing***."   *The Wall Street Journal* further noted that "[a]nalysts at KeyBanc Capital Markets estimated in a recent note

that Oracle would have to borrow $25 billion a year over the next four years," and "Oracle is already highly leveraged"—with long-term debt of about $82 billion and a debt-to-equity ratio of about 450%. Additionally, a D.A. Davidson analyst warned that "***[a] vast majority of Oracle's data center capacity is now promised to one customer, OpenAI, who itself does not have the capital to afford its many obligations***."

58. Nonetheless, Defendants continued to downplay growing risks and assure investors that the Company was poised to record massive new growth driven by its investments in AI infrastructure. For example, during Oracle's Capital Markets Day on October 16, 2025, Defendant Magouyrk touted the Company's ability to "optimize [its] data center buildout" in order to "have a higher margin," further representing that, while "[t]he ramp-up time for [data centers] has cost[s], . . . ***it's minimal and it's something that we're continually optimizing***." Defendant Magouyrk also stated, with respect to the question of "how do we actually go out and accelerate and scale this build-out," that "***there is no problem***" and "***[i]t's really just an opportunity for us to grow faster***."

59. However, after the market closed on December 10, 2025, Oracle announced disappointing second quarter 2026 financial results, including revenue growth below analysts' consensus estimate, quarterly CapEx well above analysts' estimates, and negative free cash flow of more than $10 billion.

60. During the accompanying earnings call that same day, Defendant Kehring revealed that the Company now expected an additional $15 billion of CapEx in 2026, for a total of approximately $50 billion. Despite substantially increasing its projections for spending, the Company did not increase its projections for 2026 revenue, instead reiterating its guidance of $67 billion for the year, and increased its projections for 2027 revenue by only $4 billion.

61.     Moreover, in response to an analyst's question about "how much money . . . Oracle need[s] to raise to fund its AI growth plans ahead," Defendant Magouyrk declined to provide a specific number and instead revealed only that the Company expected to spend "less" than $100 billion.

62.     That same evening, *Bloomberg* and other media outlets reported that the cost of protecting Oracle's debt against default for five years—an important measure of Oracle's credit risk—had reached a sixteen-year high that day.  As an AllianceBernstein analyst stated, "Oracle really matters because it is the harbinger of the AI capex boom," and "***[t]his repricing in debt markets is very consistent with the view that risks are building***."

63.     On this news, the price of Oracle common stock declined $24.16 per share, or nearly 11%, from a close of $223.01 per share on December 10, 2025, to close at $198.85 per share on December 11, 2025.

64.     Then, after the market closed on December 11, 2025, Oracle filed its quarterly financial report on Form 10-Q with the SEC, which revealed that the Company had "$248 billion of additional lease commitments, substantially all related to data centers and cloud capacity arrangements, that are generally expected to commence between the third quarter of fiscal 2026 and fiscal 2028 and for terms of fifteen to nineteen years that were not reflected on our condensed consolidated balance sheets as of November 30, 2025."

65.     The next day, on December 12, 2025, *Bloomberg* reported that Oracle had "pushed back the completion dates for some of the data centers it's developing for the artificial intelligence model developer OpenAI to 2028 from 2027" due to "labor and material shortages."

66.     As a result of these revelations, the price of Oracle common stock declined $8.88 per share, or approximately 4.5%, from a close of $198.85 per share on December 11, 2025, to close at $189.97 per share on December 12, 2025.

67.     In the following days, analysts and market experts further commented on the growing risks surrounding Oracle and the negative effects of Oracle's ballooning spending.  For example, analysts at CreditSights labeled the Company's newly reported lease commitments a "bombshell disclosure," noting that the Company's lease commitments had increased massively from the prior quarter, when the Company had reported just under $100 billion in lease commitments.  Moreover, as *Bloomberg* observed, "Oracle's future lease exposure far exceeds similar commitments by peers," with "a mismatch between the long duration of the property leases and much shorter contracts with key customers such as OpenAI."

68.     Analysts also warned that the ballooning RPO Defendants had promised throughout the Class Period may not come to fruition as recognizable revenue and that rising CapEx continues to present serious risks.  For example, a D.A. Davidson analyst stated that "***OpenAI is unlikely to deliver on its $300bn commitment***," suggesting that Oracle should therefore instead "restructure that contract proactively in order to deploy capital more responsibly ***instead of pretending it has $523bn of RPO***."  Likewise, analysts at J.P. Morgan Research expressed skepticism that Oracle could keep its CapEx below $100 billion, given that its 2026 CapEx "has doubled to $50bn in just two quarters," and warned that "[w]hile we still view common equity issuance as highly unlikely, we expect Oracle will ultimately need to turn to hybrid or preferred issuance to at least partially address investor concerns and keep leverage in check."

69.     Then, on December 17, 2025, *Financial Times* reported that Blue Owl Capital— "the primary backer for Oracle's largest data centre projects in the US," having invested "its own

money and rais[ed] billions more in debt to build the facilities"—had backed out of funding a $10 billion Oracle data center intended to serve OpenAI.  According to *Financial Times*, Blue Owl pulled out of the deal as a result of concerns about Oracle's spending commitments and rising debt levels.

70.    On this news, the price of Oracle common stock declined $10.19 per share, or approximately 5.4%, from a close of $188.65 per share on December 16, 2025, to close at $178.46 per share on December 17, 2025.

## V.    **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

71.    Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Oracle common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, their agents, directors and officers of Oracle, and their families and affiliates.

72.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

73.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether Defendants violated the Exchange Act;

b.    Whether Defendants omitted and/or misrepresented material facts;

c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      d.     Whether Defendants knew or recklessly disregarded that their statements were false and/or misleading;

      e.     Whether the price of Oracle common stock was artificially inflated; and

      f.     The extent of damage sustained by members of the Class and the appropriate measure of damages.

74.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

75.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## VI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

77.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

      a.     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

      b.     The omissions and misrepresentations were material;

      c.     The Company's common stock traded on an efficient market;

      d.     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

      e.     Plaintiff and the Class purchased Oracle common stock between the time the Company and the Individual Defendants misrepresented or failed to

disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

78.     At all relevant times, the market for the Company's common stock was efficient because: (1) as a regulated issuer, the Company filed periodic public reports with the SEC; and (2) the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII.    NO SAFE HARBOR

79.     Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

80.     Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII.    LOSS CAUSATION/ECONOMIC LOSS

81.     Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Oracle common stock significantly declined when

the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of Oracle common stock during the Class Period, Plaintiff and the Class suffered economic loss, i.e., damages, under the federal securities laws.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

82.    During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Oracle common stock during the Class Period.

83.    As current and former executive officers of the Company, Defendants knew, or were reckless in not knowing, that they were misleading Oracle investors by falsely touting the increased revenues and growth that would purportedly result from increased capital expenditures "right away" while downplaying and ignoring the negative effects of the Company's rising spending levels. Oracle's strategy to increase spending on AI infrastructure was crucial to the Company's business, as Defendants spoke about it on every conference call with investors, repeatedly emphasized its importance for the Company's future growth, and represented that Oracle would become the market leader in "cloud infrastructure data centers." Given the importance of Oracle's AI infrastructure strategy to the core operations of the Company, Defendants knew or should have known the truth about the results and risks of Oracle's increased spending.

84.    Further, capitalizing on Oracle's inflated stock price, the Company's senior executives collectively sold over 8.85 million shares of their personally held Oracle stock during

the Class Period, for combined gross proceeds of more than $1.87 billion. Specifically, Defendant Catz, who served as Oracle's CEO until she stepped down from that role in September 2025, shortly before the truth about Oracle began to emerge, sold nearly 8.7 million shares of her personally held Oracle stock for more than $1.82 billion in gross proceeds. Those sales represented a more than two-fold increase in the number of shares Defendant Catz sold during the comparable period preceding the Class Period. Defendant Magouyrk sold over 76,000 of his personally held Oracle shares worth approximately $20.6 million. Defendant Sicilia sold over 66,000 of his personally held Oracle shares worth approximately $20 million. Defendant Smith sold 20,000 of her personally held Oracle shares worth approximately $5.1 million. Defendants Magouyrk, Sicilia, and Smith did not sell any Oracle shares during the comparable period preceding the Class Period.

85.     Collectively, these facts give rise to a strong inference of scienter.

## X.     CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and**
**SEC Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

86.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

87.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Oracle common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

88.     Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements

not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Oracle common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

89.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

90.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

91.     The Individual Defendants acted as controlling persons of Oracle within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have

had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

93.    As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Oracle common stock during the Class Period.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## XII.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: February 3, 2026

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*Of Counsel:*

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Naumon A. Amjed (DE Bar ID #4481)
Ryan T. Degnan
Karissa J. Sauder
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com
ksauder@ktmc.com

*Counsel for Plaintiff*
*Paul Gregory Barrows*

*/s/ Gregory V. Varallo*
Gregory V. Varallo (DE Bar ID #2242)
Anthony M. Calvano (DE Bar ID #6265)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3600
greg.varallo@blbglaw.com
anthony.calvano@blbglaw.com

*Counsel for Plaintiff*
*Paul Gregory Barrows*