**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| SEB FUNDS AB and SPARINVEST S.A., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ORACLE CORPORATION, LAWRENCE J. ELLISON, SAFRA A. CATZ, CLAYTON MAGOUYRK, DOUGLAS KEHRING, and MARIA SMITH,<br><br>Defendants. | Case No. 26-127-JLH<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................................................2

II. JURISDICTION AND VENUE ....................................................11

III. PARTIES ....................................................12

A. Lead Plaintiff ....................................................12

B. Defendants ....................................................12

IV. FORMER ORACLE EMPLOYEES ....................................................15

V. FACTUAL ALLEGATIONS OF DEFENDANTS' FRAUD ....................................................19

A. Leading Up To The Class Period, Oracle Races To Pivot To AI ....................................................19

1. Oracle's Business Model ....................................................19

2. The Rise Of Generative AI ....................................................20

3. Oracle Partners With Tech Giants To Gain A Foothold In The AI Market And Grow Its OCI Business ....................................................21

4. Early In FY25, Oracle Projects Significant Revenue Growth From Its AI Partnerships....................................................22

5. Oracle Unveils The Stargate Project....................................................23

B. Unbeknownst To Investors, Defendants Knew Throughout The Class Period That Oracle's Swelling CapEx On AI Infrastructure Would Not Lead To Revenue Growth "Right Away" ....................................................24

1. Defendants Knew Oracle Could Not Rapidly Turn Its AI-Related Expenditures Into Revenue "Right Away" ....................................................26

a. Defendants Glossed Over Known Obstacles They Faced In Delivering Operational Data Centers....................................................26

b. Oracle's AI-Data Center Development Was Plagued By Operational Failures, Delays, And Excessive Expenditures, And Regularly Resulted In Delayed And Insufficiently Functional Data Centers....................................................27

c. Other FEs Confirm Oracle Experienced Significant Delays In Its Infrastructure Build-Out And That The Requisite Timelines It Represented Were Not Feasible, And Defendants Had Access To Information Showing The Same ....................................................31

d. Defendants Knew That Significant Operational Obstacles Prevented Oracle From Rapidly Converting Its AI-Related CapEx Into Revenue ....................36

2. Defendants Knew That Growing RPO Did Not Reliably Predict Near-Term Revenue Including Because Oracle Lacked The Ability To Timely Perform And Deliver On Its Obligations ....................38

a. Defendants Knew Oracle's Soaring RPO Was Subject To Significant Execution Deficiencies And Counterparty Risks Making It An Unreliable Barometer For Revenue ....................39

b. Defendants Knew Oracle Could Not Reliably Forecast When Its AI-Related CapEx Would Translate Into Near-Term Revenue ....................40

c. The Individual Defendants Had Direct Visibility Into Oracle's Inability To Timely Convert Its AI Investments Into Revenue ....................42

3. Defendants Knew Oracle Lacked The Financial Capacity To Fund Its AI-Infrastructure Build-Out ....................44

C. Throughout The Class Period, Defendants Assured Investors That Significant CapEx Would Lead To Near-Term Revenue Growth And Was Justified By Locked-In Future Revenues Proved By Ballooning RPO ....................46

1. June 11, 2025: Defendants Announce Q4 2025 Financial Results And Assure Investors That Revenue Would Swiftly Follow Swelling CapEx ....................46

2. September 9-10, 2025: Oracle Announces Q1 FY26 Financial Results, Representing That Near-Term Revenue Would Follow CapEx Right Away, Touting $455 Billion in RPO, And Claiming It Would Have The Cash To Finance Necessary Operations And Expenditures ....................51

3. Oracle Continues To Deflect Investor Concern About The Risks Of Its Aggressive AI Infrastructure Spending Strategy, Amidst CEO Shake-Up ....................57

D. The Truth Regarding Oracle's CapEx Strategy Is Gradually Revealed To The Market Through A Series Of Disclosures Showing That Expenditures Were Not Followed By Near-Term Revenue And Oracle Was Not Capable Of Supporting Its Obligations And Operations Without Taking On Significant Additional Debt, All While Defendants Continue To Mislead And Reassure Investors ....................59

1. September 24 and 25, 2025: In The First Partial Corrective Disclosures, The Truth About Oracle's Inability To Turn CapEx Into Near-Term Revenues And The Extent Of Its Inability To Fund Its AI Infrastructure Build-Out Is Incrementally Revealed To The Investing Public Based On Oracle's $18 Billion Bond Sale ....................60

2. October 13-16, 2025: Defendants Offer Further Words Of Comfort On CNBC And At Oracle AI World ....65

3. December 10 and 11, 2025: In The Next Partial Corrective Disclosures, Oracle Reveals Increased CapEx But Stagnant FY26 Guidance, Negative Q2 FY26 Financial Results, And Billions In Lease Commitments Stretching Over The Next Twenty Years ....68

4. December 17, 2025: In The Final Corrective Disclosure, Blue Owl Capital Backs Out Of $10 Billion Dollar Funding Of Data Center, Citing Concerns For Oracle's Spending Commitments And Mounting Debt ....71

VI. POST-CLASS PERIOD EVENTS ....72

VII. DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ....74

A. June 11, 2025 – 4Q 2025 And FY 2025 Earnings Release And Earnings Call ....74

B. June 18, 2025 – FY 2025 Form 10-K ....77

C. September 9, 2025 – 1Q 2026 Earnings Release And Earnings Call ....80

D. September 10, 2025: Form 10-Q ....82

E. October 16, 2025 - Oracle AI World: Financial Analyst Day Session ....83

VIII. ADDITIONAL SCIENTER ALLEGATIONS ....84

IX. LOSS CAUSATION ....92

A. First Partial Disclosures: September 24 And 25, 2025 ....93

B. Second Partial Disclosures: December 10 And 11, 2025 ....94

C. Final Partial Disclosure: December 17, 2025 ....96

X. CLASS ACTION ALLEGATIONS ....97

XI. A PRESUMPTION OF RELIANCE APPLIES ....99

XII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY ....100

XIII. CAUSES OF ACTION ....101

XIV. PRAYER FOR RELIEF ....104

XV. JURY TRIAL DEMANDED ....105

Court-appointed Lead Plaintiffs SEB Funds AB ("SEB Funds") and Sparinvest S.A. ("Sparinvest") (together, "Lead Plaintiff" or "Plaintiff"), by and through their counsel, file this Amended Class Action Complaint for Violations of the Federal Securities Laws individually and on behalf of a class ("Class") consisting of all persons and entities who purchased or otherwise acquired the securities of Oracle Corporation ("Oracle" or the "Company") beginning after 4:05 PM ET on June 11, 2025, through December 16, 2025, inclusive (the "Class Period"), and were damaged thereby. Plaintiff asserts claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants (defined below).

Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based on the ongoing investigation of its undersigned counsel. This investigation includes review and analysis of, among other things: (i) Oracle's filings with the SEC; (ii) transcripts of the Company's conference calls with analysts and investors; (iii) Oracle presentations, press releases, and reports; (iv) research reports by securities and financial analysts; (v) news and media reports concerning Oracle and other facts related to this action; (vi) price and volume data for Oracle's securities; (vii) information provided by former Oracle employees ("FE(s)"); and (viii) other material and data identified herein. Court-Appointed Lead Counsel's investigation into the factual allegations continues and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This securities fraud class action arises from material misrepresentations and omissions that Oracle and senior executive Defendants Lawrence J. Ellison ("Ellison"), Safra A. Catz ("Catz"), Clayton Magouyrk ("Magouyrk"), Douglas Kehring ("Kehring"), and Maria Smith ("Smith") made during the Class Period (beginning after 4:05 PM ET on June 11, 2025, through December 16, 2025, inclusive) regarding the Company's skyrocketing AI-related capital expenditures ("CapEx") which would, Defendants claimed, rapidly and directly translate into substantial near-term revenue growth.

2. For decades, Oracle has been one of the technology sector's most prominent software companies. But as the industry shifted significantly first to cloud computing and then to artificial intelligence ("AI")-related offerings and services, Oracle found itself trailing larger competitors, including Amazon, Microsoft, and Google (collectively, "the Big Three"). By the start of the Class Period, Oracle's future growth increasingly depended on its ability to transform itself from a traditional database and cloud software company into a leading provider of generative AI cloud infrastructure.

3. Oracle trailed not only its competitors' size and capitalization, but also their capacity to deliver the processing power and data storage required to compete in the emerging generative AI infrastructure market. Unlike the traditional database and software domains in which Oracle had long operated, generative AI requires enormous computational power and specialized, resource-intensive data centers. Building, equipping, and operating this infrastructure is extraordinarily expensive, time-consuming, and operationally complex. While competitors such as Amazon, Microsoft, and Google had the experience, operational capabilities, and financial

resources to execute and fund a sustained move into the generative AI sphere, Oracle lagged far behind.

4. To compete, Oracle strained to rapidly expand and modify its proprietary Oracle Cloud Infrastructure ("OCI") operations to support generative AI activities through billions of dollars in CapEx. At the same time, because it lacked sufficient capital and already carried substantial debt, Oracle needed to finance those expenditures and convince investors that its unprecedented AI infrastructure investments would rapidly translate into substantial near-term revenue growth.

5. During the Class Period, Defendants misled investors by repeatedly assuring the market that Oracle's rapidly increasing CapEx, undertaken to transform the Company into a major AI infrastructure provider, would drive accelerating and continuous revenue growth right away. Defendants represented, for example, that Oracle's massive AI-related infrastructure investments (reflected in ever increasing CapEx) were being deployed into revenue-generating equipment that would be immediately placed into operational AI data centers to meet voracious demand, such that, as those capital expenditures were made, revenue and profits would directly follow. Defendants further represented that Oracle's ballooning Remaining Performance Obligations ("RPO") (contracted revenues, for services or products yet to be delivered to a customer, that *may* become revenue in future periods) confirmed that this accelerating revenue growth over the coming years was essentially locked in. And, relatedly, they represented that Oracle had the current financial capacity to fund all of its ongoing operations and CapEx needs.

6. Defendants, however, failed to disclose that the AI-related revenue growth they touted would not follow Oracle's rising CapEx outlays on the near-term timeline they represented because the Company faced acute execution, counterparty, and financing headwinds that it was

ill-prepared to overcome. Oracle's ability to realize that revenue at all—let alone on the near-term timeline represented to investors—depended not only on its ability to timely equip and deploy the infrastructure necessary to meet its contractual obligations, but also on Oracle and its key customers securing the financing necessary to honor their respective near- and long-term commitments. Importantly, Oracle's representations about near-term revenue flowing from its AI-related CapEx reinforced the impression that the Company would generate increasing cash flows to reinvest in and fund the extensive build-out necessary to support its AI infrastructure business.

7. Investor and customer confidence in this narrative was critical to sustaining the Company's aggressive spending strategy and efforts to compete in the AI infrastructure market. But in truth, the purported turnkey, accelerating near-term revenue growth was illusory and Oracle could not finance this huge undertaking without assuming billions of dollars of additional debt, including bonds with uncommonly long duration—a risky strategy in the technology sector, where constant and rapid innovation routinely alters the competitive landscape.

8. When investors learned through incremental disclosures that Oracle's exploding CapEx was not generating the near-term revenue growth Defendants had repeatedly represented, and that Oracle's huge AI pivot was far riskier than represented because it would be funded not with near-term revenue from CapEx and present funds but instead with billions in additional long-term debt and speculative potential future revenues, Oracle's stock price declined sharply, damaging investors.

9. At the outset of the Class Period, after 4:05 PM ET on June 11, 2025, as Oracle commenced its 2026 fiscal year ("FY26"), it highlighted ***"dramatically higher"*** revenue and raised its FY26 revenue guidance by 16%, to an anticipated $67 billion, due to ***"skyrocketing"*** OCI revenue. At the same time, Oracle announced a new $25 billion in anticipated CapEx, while

assuring the market that only a short runway stood between its increasing CapEx spend and return on investment ("ROI") for investors in the form of recognized revenue. For example, Defendant Catz stated that ***"[t]he vast majority of our CapEx investments are for revenue-generating equipment that is going into data centers. . . . As we bring more capacity online, our revenue and profit growth will further accelerate***."[1]

10. When analysts zeroed in on the elevated CapEx, asking for "more color" on what it was spent on, how the spending was helping Oracle "yield more revenue," and how Oracle knew "$25 billion [was] the right number for this year," Catz emphasized the direct relationship between CapEx and Oracle's ability to generate near-term revenue: "when we all of a sudden have higher CapEx, it means ***we are filling out data centers and we are buying components to build our computers, . . . and we are putting them on the floor***."

11. Despite Defendants' repeated assurances that Oracle's mounting CapEx was being rapidly converted into operational, revenue-generating AI infrastructure, the Company was not simply "filling out data centers" and "putting [computers] on the floor" to promptly generate revenue. As numerous well-placed former employees recount, Oracle's efforts to rapidly transition into a major provider of AI infrastructure were plagued by severe headwinds, including significant and widespread execution failures and deficiencies, leaving the Company incapable of delivering the near-term revenue growth Defendants repeatedly promised to investors.

12. For example, former managers from Oracle's AI Infrastructure group relate that it was widely known internally, including by Oracle's senior management, that Oracle failed to deliver sufficiently functional data centers by their delivery dates due to myriad execution

[1] Unless otherwise noted, all emphasis is added.

problems and delays. One former employee, a senior director working in Oracle's AI operations group during the Class Period, estimated that this happened ***50 to 75% of the time***. Another vice president working in AI operations during the Class Period, noted that Oracle had a practice of declaring a data center handed over to the customer when it only had 80% of the required capacity. According to former employees working throughout the Company during the Class Period, the delivery dates that Oracle promised to data center customers were almost always unrealistic and even ridiculous, yet Oracle consistently overcommitted and underdelivered.

13. Multiple former employees independently corroborate Oracle's failure to timely deliver sufficiently functional data centers citing Oracle's lack of experience, know-how, and skilled manpower, and its practice of ordering incorrect or superfluous equipment. As one former finance executive explained, Oracle made it publicly appear that Oracle could just turn on a switch and revenue would come, when in reality, bringing AI infrastructure online required Oracle to build or adapt spaces capable of providing the energy needed to power and cool equipment; procure the necessary equipment (and new and additional equipment as technology became tapped out and/or outdated) to meet specific customer needs; and provide the skilled workers necessary to make the equipment operational for a customer's purposes.

14. Numerous former employees confirmed Oracle's chronic failures in ramping up these specialized operations during the Class Period, and stated that sweeping layoffs made to counterbalance the Company's increased spending and deteriorating cash position further undermined its ability to execute. They also further confirmed that the Individual Defendants personally received and had access to regular internal reporting on the foregoing issues, with Defendants Magouyrk and Ellison personally approving and signing off on certain related actions or expenditures.

15. Additionally, while Oracle represented in its June 18, 2025 FY25 10-K that it had sufficient cash on hand to finance its infrastructure build-out and touted its growing RPO as proof of future revenue, it failed to disclose that the build-out was becoming increasingly dependent on significant additional borrowing (with unusual terms), despite broad layoffs and cuts, exposing the Company to substantial, long-term credit risk as it invested heavily in infrastructure largely dedicated to the money-losing start-up OpenAI.

16. On September 9, 2025, Oracle announced that it was increasing its CapEx for FY26 by a further $10 billion, to a whopping $35 billion. When asked about the ROI on the sharply increased spend for FY26, Catz assured investors that Oracle was effectively "***handing it over to generate revenue right away*** . . . ***we have a very good line of sight for our capabilities to put this out and basically to just spend on that CapEx right before it starts generating revenue***." Oracle further represented in its Q1 FY26 10-Q, "We believe that ***our current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our working capital, capital expenditures and contractual obligations requirements***." Oracle also announced that RPO had grown to $455 billion, up 359%, attributing this increase to four new contracts signed with three different customers.

17. Following these disclosures, Oracle's share price increased 40%, and Defendant Ellison momentarily became the richest man in the world. At the same time, analysts embraced precisely the narrative Defendants had promoted, lauding Oracle as "one of the best ways for public market investors to capitalize on the growing success of major AI Labs and their insatiable appetite for GPU compute."

18. The truth about Oracle's ability to convert its unprecedented AI-related CapEx into the near-term revenue it had repeatedly promised—and to finance the massive infrastructure build-out required to satisfy its performance obligations with existing funding—began to emerge through a series of partial disclosures beginning on September 24, 2025. On that day, the market learned that Oracle was selling ***$18 billion*** in bonds, some of which would not reach maturity for ***40 years***. This was inconsistent with Oracle's repeated representations that its AI expansion was sufficiently funded and that its rapidly increasing CapEx would quickly generate accelerating revenues to support the Company's aggressive infrastructure build-out.

19. Investors expressed concerns about Oracle's widening cash needs, negative cash flows, and credit and other risks, noting the unusual terms of the bonds. For example, S&P Global Ratings ("S&P") warned that "Oracle competes with much larger hyperscalers including Microsoft Inc.'s Azure, Amazon.com Inc.'s AWS, and Alphabet Inc.'s Google Cloud, all of which have greater financial flexibility to outspend Oracle and weather potential downturns." Investors noted that the unconventional terms of the bonds (including the long duration) signaled heightened risks in Oracle's AI infrastructure expansion and its ability to generate the near-term revenue growth Defendants had promised. A MarketWatch report noted questions about Oracle's narrative that its AI investments would quickly translate into revenue, with market participants describing the bond issuance as "unconventional" and observing that: "'when [Oracle's RPOs] get[] booked to revenue is uncertain.'" "We've seen 40-year deals, but they're typically with companies with staying power, such as Coca-Cola Co. . . . Those sort of maturities are 'unusual' with technology, because 'who knows who will be around in 40 years.'"

20. The developments continued the following day, September 25, 2025, when Rothschild & Co. Redburn ("Rothschild") initiated coverage of Oracle at "Sell," asserting based

on original analysis that the market was "materially overestimat[ing]" future growth resulting from Oracle's AI deals. Rothschild warned that the Company's promises of soaring new revenues from increased AI infrastructure business were "***unlikely to materialize***" and set a $175 price target for Oracle—representing a 40% pullback from current levels.

21. In response to this cascading news, the price of Oracle common stock plunged more than $22 over two days.

22. Notably, Defendant Catz had abruptly announced her departure from her longtime position as Oracle Chief Executive Officer ("CEO") just days earlier, on September 22, 2025. Since the start of the Class Period just three months earlier, she had sold off Oracle stock holdings for proceeds of over ***$1.8 billion***.

23. Tamping down concerns surrounding Oracle's AI expansion, Defendants aggressively reaffirmed their rosy narrative: that Oracle was delivering and would continue to profitably deliver on its rapid pivot into AI infrastructure. For example, in an October 13, 2025 interview on CNBC, Oracle's newly installed co-CEO, Defendant Magouyrk, asserted confidence Oracle would realize the anticipated revenue from its announced $300 billion OpenAI deal, but represented that, even if OpenAI failed to perform, Oracle could readily repurpose the infrastructure for another customer, with Magouyrk stating while the infrastructure was "in some ways . . . customized" it "is largely the same."

24. Two days later, Magouyrk characterized the costs associated with "ramp-up" for data centers as "***minimal***," assuring investors that "***there is no problem***" with Oracle's accelerating build-out. Meanwhile, Defendant Kehring continued to assure investors that RPO remained "***the clearest indicator of the revenue that is about to come***."

25. Contrary to these assurances, less than two months later, the market learned the truth through additional corrective disclosures. First, on December 10, 2025, Oracle announced that it would be spending an ***additional $15 billion*** on CapEx in FY26, but that revenue guidance for the year remained unchanged—a disclosure fundamentally inconsistent with Defendants' repeated assurances that Oracle's increasing CapEx would translate into substantial near-term revenue "right away."

26. Following this partial corrective disclosure, the price of Oracle common stock plunged $24.16 per share, or nearly 11% in one day.

27. Furthermore, on December 11, 2025, Oracle made another "bombshell disclosure," stunning analysts: Oracle had committed to spend ***$248 billion on lease obligations over the next fifteen to nineteen years*** starting in Q3 FY26 (i.e., the current quarter)—contrary to Defendants' representations that Oracle's escalating CapEx reflected equipment being promptly deployed into operational data centers that would generate near-term revenue and Magouyrk's assurances that data center ramp-up costs were minimal. Oracle's lease commitments dwarfed those of the Big Three industry competitors, and the long duration of the lease obligations were fundamentally mismatched with the much shorter duration of the AI-infrastructure contracts expected to generate the revenue supporting those commitments. This announcement also called into question whether the Company could satisfy its hundreds of billions of dollars in RPO while simultaneously funding enormous off-balance sheet lease commitments and the CapEx required to bring functional data centers online.

28. Following these developments, the price of Oracle common stock declined another $8.88 per share, on December 12, 2025.

29. Finally, on the morning of December 17, 2025, the *Financial Times* reported that a key financing partner—Blue Owl Capital— had withdrawn from financing a $10 billion Oracle data center intended to serve OpenAI, due to concerns about Oracle's spending commitments and rising debt levels. The report about this deeply informed partner walking away from Oracle further undermined Defendants' representations about Oracle's ability to finance, deliver, and realize revenues promptly from its AI expansion. Oracle's stock price declined more than $10 per share on the news.

30. As a result of Defendants' wrongful acts and omissions, and the substantial decline in the market value of Oracle's securities following the sequential disclosure of the relevant truth, Plaintiff and other members of the Class (defined below) suffered significant damages. This lawsuit followed.

## II. JURISDICTION AND VENUE

31. Plaintiff's claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

32. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

33. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Oracle is incorporated in this District and because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

34. In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

35. Plaintiff SEB Funds AB ("SEB Funds") is one of the largest asset managers in Northern Europe. Headquartered in Stockholm, Sweden (corporate identity number 556197-3719), SEB Funds offers a broad range of funds and tailored portfolios for institutional investors, as well as for retail and private banking clients. As set forth in the certification attached hereto as Exhibit 1, SEB Funds purchased or otherwise acquired Oracle securities at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

36. Plaintiff Sparinvest S.A. ("Sparinvest") is a fund management company headquartered in Luxembourg City, Luxembourg (business register number B81400). Sparinvest offers investment to retail and institutional investors in selected areas. As set forth in the certification attached hereto as Exhibit 2, Sparinvest purchased or otherwise acquired Oracle securities at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

37. Sparinvest and SEB Funds are collectively referred to herein as Lead Plaintiff or Plaintiff.

### B. Defendants

38. Defendant Oracle Corporation is a Delaware corporation. Oracle is presently headquartered in Austin, Texas. Oracle moved its headquarters from Redwood City, California, to

Austin in December 2020. Defendant Ellison announced in April 2024 that Oracle will be moving its world headquarters once again, this time to Nashville, Tennessee. Oracle started demolition and groundwork on its new $4.5 billion headquarters in Nashville (where it currently has multiple office locations) in early 2026. During the Class Period, Oracle published SEC Forms 10-Q on September 10, 2025 (reporting on the quarterly period beginning June 1, 2025 and ending August 31, 2025) ("Q1 FY26") and December 11, 2025 (reporting on the quarterly period beginning September 1, 2025, and ending November 30, 2025) ("Q2 FY26").[2]

39. Defendant Lawrence J. Ellison is the Company's Executive Chairman and Chief Technology Officer. He began serving in these roles starting in September of 2014. Prior to these roles, from June 1977 until September 2014, Ellison served as Chief Executive Officer of Oracle. Ellison's primary residence is in Florida.

40. Defendant Safra A. Catz was the Company's Chief Executive Officer during the Class Period, until September 22, 2025, when Oracle announced her step-down and transition to her current role of Executive Vice Chair of the Board. She became CEO in 2014. Catz has served in various roles since she began at Oracle in 1999. Prior to becoming Chief Executive Officer, she served as President from January 2004 to September 2014; Chief Financial Officer from April 2011 until September 2014; and as a Director since October 2001. She had also previously served as Chief Financial Officer (November 2005 through September 2008) and Interim Chief Financial Officer (April 2005 through July 2005). Catz's primary residence is in Florida.

---

[2] Oracle's fiscal year begins June 1. Thus, its first fiscal quarter is June 1-August 31; its second fiscal quarter is September 1-November 30; its third fiscal quarter is December 1-February 28; and its fourth fiscal quarter is March 1-May 31.

41. Defendant Clayton Magouyrk is the Company's Co-Chief Executive Officer, having served in this role since September 22, 2025, succeeding Safra Catz as CEO. Magouyrk joined Oracle in 2014. From 2014 through 2019, Magouyrk served as President in various roles. From December 2019 through June 2025, Magouyrk served as Executive Vice President of various groups, including Cloud Infrastructure. During the Class Period, beginning in June 2025, he entered the role of President, OCI, until he was promoted to Co-Chief Executive Officer in September 2025. During the Class Period and thereafter, Magouyrk led OCI. Magouyrk resides in Nashville, Tennessee.

42. Defendant Douglas Kehring is the Company's Executive Vice President and Head of Operations, a role he assumed post-Class Period, in April 2026. During the Class Period, Kehring served in his former role as Principal Financial Officer (from September 22, 2025 through April 2026), and, prior to that, as Executive Vice President, Head of Operations, from 2015 through September 2025. During the Class Period, Kehring played a leading role in overseeing the Company's investments in data centers and expansion into cloud infrastructure. Kehring's primary residence is in California.

43. Defendant Maria Smith is the Company's Executive Vice President and Chief Accounting Officer, a position she has held since December 2022. Smith joined Oracle in 1999. From November 2012 through September 2017, Smith served as Vice President, Global Controllers Organization and Mergers and Acquisitions. From September 2017 through December 2020, she served as Senior Vice President, Assistant Corporate Controller. Beginning in December 2020 through December 2022, she held the role of Senior Vice President, Corporate Controller. Smith resides in Ireland.

44. Defendants Ellison, Catz, Magouyrk, Kehring, and Smith are collectively referred to herein as the "Individual Defendants."

45. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

46. Oracle and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. FORMER ORACLE EMPLOYEES [3]

47. Multiple FEs report relevant information related to the Company's revenues, operations, CapEx, and demand for its products during and around the Class Period. The FEs and a summary of their responsibilities and roles with respect to the facts, circumstances and events alleged herein are set forth in the remainder of this subsection.

48. FE-1 was employed at Oracle for approximately 25 years, including most recently as a Vice President in Finance, until his separation in October 2025. In this role, which he held

[3] All former Oracle employees ("FE") are referred to using masculine pronouns to protect their anonymity.

throughout the Class Period, FE-1 oversaw more than 170 employees, leading a team that maintained a platform containing all of Oracle's internal finance data. Through his senior position overseeing global finance and operations, FE-1 had direct and first-hand knowledge of the Company's revenues and expenditures, including Oracle's use and reporting of CapEx and RPO. Most recently, FE-1 reported to Matt Stirrup, Executive Vice President of Finance, who in turn reported to Oracle's CFO Defendant Kehring. Prior to a reorganization, FE-1 reported to Tom Germack, Senior Vice President ("SVP") of Revenue Operations. Senior leadership in Oracle's C-Suite would rely upon FE-1's team for insights and reporting regarding sales, revenue, and Company performance.

49. FE-2 was employed at Oracle from the Spring of 2024 to the Winter of 2025. During this time, he was a vice president in AI operations. In this role, he was responsible for deployment and operations of Oracle's AI GPU fleet for the Company's data center infrastructure projects. FE-2 reported to several Oracle SVPs at different times throughout his employment with Oracle, including Sudha Raghavan, SVP of AI Infrastructure.

50. FE-3 was employed at Oracle from the Summer of 2024 through the Spring of 2026. During this time, he worked as a senior director of AI operations. In this role, he worked as a leader of a team of engineers to deploy Oracle's AI GPU platforms for data center infrastructure projects. FE-3 reported to a Vice President of AI operations until late 2025, and then to Sudha Raghavan, SVP of AI Infrastructure.

51. FE-4 was employed at Oracle from 2018 through the Spring of 2026. During this time, he worked as a data center technician. In this role, specifically in late 2025 and early 2026, FE-4 was responsible for fixing server issues, installing equipment, and generally working on facilitating the functionality of Oracle's Stargate AI data center project in Abilene, Texas (defined

further *infra*). In this role, FE-4 reported to a data center manager based in Northern Virginia.

52. FE-5 was employed at Oracle from late 2022 until early 2026. FE-5 was a Program Manager in Oracle Cloud Finance, reporting to a Senior Manager who reported through the Chief Finance Officer of OCI. As part of his role with Oracle, FE-5 was responsible for the development of a dashboard tool that Oracle used to track expected equipment costs in Oracle's data centers.

53. FE-6 was employed at Oracle from before the Class Period until mid-2026. FE-6 was a Director with responsibilities for product management and customer storage. In this role, FE-6 was responsible for monitoring and servicing the top twenty-five revenue customers, in addition to customers like NVIDIA, with respect to their storage needs.

54. FE-7 was employed at Oracle from before the Class Period until the Fall of 2025. During that time, FE-7 served as principal designer. In this role, FE-7 was responsible, in part, for designing the liquid cooling system used in Oracle's data centers world-wide. FE-7 spent significant time on-site at Oracle's data center project in Abilene, Texas, related to the Stargate initiative.

55. FE-8 was employed by Oracle from the Fall of 2023 to the Fall of 2025. During this time, he worked as a senior data center technician, responsible for overseeing infrastructure projects, such as server deployments, at data centers in Arizona. FE-8 reported to a data center manager, who reported to the Phoenix director of operations, who reported to senior leaders, at the Vice President and SVP levels, doing walk-throughs of data centers under development.

56. FE-9 was employed at Oracle from the Fall of 2021 through the Spring of 2026. During this term, he served as a Vice President, with responsibilities related to AI partner and applications development. In this role, FE-9 was responsible for handling supply chain issues and building market share for Oracle.

57. FE-10 was employed at Oracle from before the Class Period through early 2026. During this time, he was a director working on corporate events, and was responsible for sales engagement strategy for customer attendance at events such as Oracle AI World. In this role, FE-10 reported to Luca Balbo, Vice President of Events. Balbo reported to an SVP, who reported to the Executive Vice President ("EVP") of Revenue Operations, Jason Maynard. Maynard reported to the co-CEO, Defendant Magouyrk.

58. FE-11 was employed at Oracle from the Spring of 2020 through the Spring of 2026. During this time, FE-11 served as a principal cloud architect and Consulting Technical Manager, Cloud Engineering Services (CES). In these roles, FE-11 was primarily responsible for working with Oracle customers on implementing OCI-based solutions. During the Class Period, FE-11 reported to Dennis Jiawan, a Consulting Practice Director and Delivery Manager.

59. FE-12 was employed at Oracle from the Spring of 2013 through the Spring of 2026. During that time, FE-12 served as Senior Manager, core infrastructure engineering. In that role, FE-12 was responsible for leading global cloud and infrastructure engineering operations across AWS, Azure, and OCI, managing a distributed team that supported nine global business units and provided multiple services. In that capacity, FE-12 reported to Karoly Laczi, Vice President Industry Cloud Services, who in turn reported to Bengt-Erik Norum, Vice President. Norum reported to SVP Dayne Sampson, who reported to Michael Sicilia, first an EVP and then a co-CEO of Oracle.

60. FE-13 was employed at Oracle from 2017 to the beginning of Q4 2025. FE-13 worked in government procurement throughout his tenure. FE-13 was responsible for fulfilling orders for equipment to be used in data centers for government clients. In that capacity, he reported

to a procurement manager who oversaw both the U.S. government procurement team and the commercial procurement team that was based in Mexico.

61. FE-14 was employed at Oracle from early 2020 to late 2024. During that time, FE-14 held a number of roles, most recently as a senior data center supervisor. In that capacity, he was responsible for leading a team that built data centers to supply cloud infrastructure to government clients.

62. FE-15 was employed at Oracle from before the Class Period through April of 2026. During that time, FE-15 served in a managerial role in the City & County Public Sector. In this role, he was responsible for cloud and infrastructure offerings, assisting the public sector with Oracle business. FE-15 worked under Denis Melnykov, Senior Director North America.

## V. FACTUAL ALLEGATIONS OF DEFENDANTS' FRAUD

### A. Leading Up To The Class Period, Oracle Races To Pivot To AI

#### 1. Oracle's Business Model

63. Oracle began as a database management company for business customers. Initially, it licensed its software for companies to run on local servers. Later, as enterprise customers turned to cloud computing, Oracle migrated its business model to offer remote data hosting services in the form of OCI. As of the beginning of the Class Period, the cloud and license segment of Oracle's business accounted for approximately 86% of Company revenues.

64. Amazon and Microsoft were early leaders in cloud computing, and by 2021, Oracle held a significantly smaller share of the cloud infrastructure market than both Amazon Web Services and Microsoft.

65. In recent years, however, the performance of Oracle's predominant cloud and software business has become increasingly driven by cloud services related to supporting AI, in response to exploding market interest in generative AI.

2. The Rise Of Generative AI

66. In November of 2022, OpenAI publicly released ChatGPT, an AI chatbot that employs generative AI to interact with humans in a realistic way, asking follow-up questions and providing suggestions, based on text prompts. This operation is powered by a large language model ("LLM"), a type of AI system that is trained on massive datasets by ingesting data and examining relationships between data elements, which acts as the neural network underlying the user application.

67. Within two months, ChatGPT reached over 100 million users, becoming the fastest-growing consumer product in human history. Since 2022, AI has spread into more aspects of daily life. Companies and investors alike have come to view AI as an immense, and potentially transformative, opportunity for those businesses that can capitalize on these developments.

68. Generative AI requires an immense amount of processing or computing power—sometime referred to as "compute"—to operate. Generating computational power requires data centers where thousands of microchips, such as graphics processing units ("GPUs"), must be connected to work as a single supercomputer.

69. Leading up to and during the Class Period, Oracle endeavored to gain a position in the emerging generative AI market and specifically, to make itself into a major infrastructure and computational power provider. In general terms, Oracle would rent out computing power (including servers, data center space, and GPUs) to companies such as OpenAI, who would pay Oracle to run their AI workloads on Oracle's cloud servers. But to do this, Oracle needed to vastly increase and develop its ability to provide the necessary computational capacity.

70. To increase computational capacity, Oracle needed to procure limited and costly resources, including (1) computational power hardware, largely GPUs; and (2) highly specialized data centers equipped to house and power the hardware.

71. The first necessity, computational hardware, is akin to the engine required to run AI. It includes specialized, lightning-speed microchips, such as GPUs, which use parallel processing to execute thousands of simultaneous tasks. Further, when used for AI computing, GPUs wear out rapidly. And, because of the pace of AI adoption and innovation, these chips also can quickly become outdated.

72. Oracle also needed specialized data centers where the computational hardware could run. Such data centers take significant time to construct, often several years, and the specific equipment they contain must be configured and tested before it can be used. Data centers require access to large volumes of electricity to power the hardware and advanced cooling systems to reduce the extreme heat generated during data processing. For example, an AI data center can run through as many as five million gallons of water per day, as much as a town of 50,000 people, and can use as much power as 100,000 homes or more.

73. Thus, to generate revenue from an AI services partnership with a company like OpenAI, Oracle needed to provide computational power through OCI at newly specified data center sites. As investors ultimately learned by the end of the Class Period, however, rapidly delivering the required combination of high-performance hardware and specialized infrastructure at scale—and thereby generating the substantial near-term revenues Defendants had repeatedly promised—entailed daunting execution, financing, and operational challenges that Oracle was not prepared to overcome.

### 3. Oracle Partners With Tech Giants To Gain A Foothold In The AI Market And Grow Its OCI Business

74. From October 2022 through June 2025, Oracle entered into billion-dollar contracts and pushed to grow its position as a provider of Al-related cloud computing services. For example, on October 18, 2022, Oracle and NVIDIA Corporation ("NVIDIA") announced a multi-year

partnership that would "bring the full NVIDIA accelerated computing stack," to Oracle's OCI business. This partnership involved Oracle adding tens of thousands of NVIDIA's chips to its cloud, as well as affording access to NVIDIA software to Oracle customers. Oracle touted these steps as reflective of OCI's new prominence as a major cloud compute provider.

75. As investor fervor around AI applications and LLMs grew, Oracle tried to establish itself in the AI-infrastructure space. On June 11, 2024, when it announced its 2024 fiscal year ("FY24") financial results, Oracle announced a new partnership with OpenAI and Microsoft. The deal called for OCI to provide additional infrastructure to host Microsoft's Azure cloud, in order to support OpenAI. Ellison stated that this partnership was a part of the "race to build the world's greatest large language model"—one that was "fueling unlimited demand for Oracle's Gen2 AI Infrastructure."

76. Despite the below-forecast earnings the Company simultaneously announced, Oracle's stock price soared at the announcement. As noted by Holger Mueller of Constellation Research in June of 2024, "investors are clearly very excited about Oracle's longer-term prospects in the AI industry."

### 4. Early In FY25, Oracle Projects Significant Revenue Growth From Its AI Partnerships

77. By September 2024, early in its 2025 fiscal year ("FY25"), Oracle was representing to investors that its business would experience steep revenue growth through FY29—largely supporting its claims by reference to RPO tied to AI-related contracts in OCI.

78. A financial metric used by Oracle (and certain other companies), refers to revenue that is expected to be received and/or recognized upon the future performance of contractual obligations. To the extent they use it, public companies are required to disclose RPO in financial statement footnotes. In its FY24 10-K issued June 20, 2024, Oracle defines RPO as "[t]rade

receivables, net of allowance for credit losses, and deferred revenues" which "represent contracted revenues that had not yet been recognized, and include deferred revenues; invoices that have been issued to customers but were uncollected and have not been recognized as revenues; and amounts that will be invoiced and recognized as revenues in future periods."

79. Importantly, Oracle used RPO as a signal to investors that revenue in coming years was effectively locked in and predictable and justified current CapEx.

80. For example, on September 12, 2024, at Oracle's Financial Analyst Meeting Day, Defendant Kehring unveiled Oracle's five-year total growth projection, which placed FY26 revenue at greater than $66 billion, and FY29 revenue at an astronomical $104 billion. Kehring stated that the recent RPO increase to $99 billion "clearly shows the pent-up interest and demand in the Oracle cloud." Kehring also stated that Oracle planned to double CapEx in FY25, which he claimed would drive increasing Cloud revenue.

81. Following these statements, on September 13, 2024, shares in Oracle jumped by more than 6% in premarket trading, with Wolfe Research analysts noting on September 12, 2024, that "Oracle management outlined a clear path for achievement" of the growth plan.

5. <u>Oracle Unveils The Stargate Project</u>

82. On January 21, 2025, in an Oval Office press conference alongside President Donald Trump, Oracle announced The Stargate Project ("Stargate"): a partnership between Oracle, OpenAI, and investment conglomerate SoftBank to invest $500 billion to build data centers across the United States. Specifically, Stargate would build 20 data centers, each at 500,000 square feet—roughly $25 billion per data center—to ultimately provide up to ten gigawatts of processing capacity from those data centers by 2029.

83. The price of Oracle stock surged by 7% as the Stargate announcement boosted investor confidence in Oracle's AI-related outlook. For example, on January 21, 2025, Barclays

analysts called Oracle an "AI winner," and on January 22, 2025, BNP Paribas analysts wrote that "with Softbank likely shouldering much of the financial burden for Stargate, we like the risk/reward for Oracle."

84. Continuing into the Spring of 2025, Defendants disclosed increased CapEx spending, while asserting that Stargate and other significant AI partnerships and projects would lead to substantial near-term revenue growth.

85. For example, on March 10, 2025, Oracle issued a press release announcing financial results for Q3 FY25 that disclosed CapEx of approximately $12 billion dollars—up from $4 billion in the corresponding prior-year quarter. Citing "signed cloud agreements with several world leading technology companies including: OpenAI, xAI, Meta, NVIDIA and AMD," as driving RPO up 63%, Defendant Catz was quoted as stating that this would "drive a 15% increase in Oracle's overall revenue ***in our next fiscal year beginning this June***." In this same release, Defendant Ellison specifically noted that Oracle was "on schedule to double our data center capacity this calendar year" as "[c]ustomer demand is at record levels."

86. On the corresponding earnings call, Catz stated "[o]ur confidence in meeting our $6 billion revenue target for FY26 is now stronger [] than ever and represents around a 15% growth rate."

87. Following this call, on March 10, 2025, Barclays analysts reported "very strong RPO growth" "from signed deals" and Oracle's "growth guidance for FY26" which "both ***confirm the revenue acceleration story***."

**B. Unbeknownst To Investors, Defendants Knew Throughout The Class Period That Oracle's Swelling CapEx On AI Infrastructure Would Not Lead To Revenue Growth "Right Away"**

88. During the Class Period, from after 4:05 PM ET on June 11, 2025, through December 16, 2025, as detailed *infra*, Defendants repeatedly assured investors that Oracle's

ballooning AI-related CapEx was being converted into operational, revenue-generating infrastructure and would rapidly translate into substantial near-term revenue growth, enabling Oracle, among other things, to reinvest in the continued expansion of its AI infrastructure.

89. For example:

- On June 11, 2025, in announcing Oracle's Q4 FY25 financial results, Ellison stated: "***[w]e expect OCI consumption revenue to grow even faster in FY26. OCI revenue growth rates are skyrocketing—so is demand***." On an earnings call later that evening, Catz doubled-down on the claim that revenues would accelerate in FY26, representing that the $25 billion in announced CapEx spending was largely for "***revenue-generating equipment that is going into data centers***" which would "***further accelerate***" "***our revenue and profit growth***."

- On June 18, 2025, Defendants Oracle, Catz and Ellison represented to the market that Oracle's "***current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our working capital, capital expenditures and contractual obligations requirements***."

- On September 9, 2025, in announcing Oracle's Q1 FY26 financial results, Defendants couched a disclosure of sharply rising CapEx spending by touting its $455 billion in RPO and claiming that the now-$35 billion in CapEx was for "***revenue-generating equipment that is going into the data centers***" which would lead to increased revenue "***right away***." Defendant Catz further claimed that Oracle had "***a very good line of sight for our capabilities to put this out and basically to just spend on that CapEx right before it starts generating revenue***."

90. As set forth more fully below, contrary to Defendants' public assertions, FEs establish that Defendants knew (or recklessly disregarded) that Oracle's swelling CapEx was not rapidly translating into the accelerating near-term revenues they repeatedly promised investors, and that the Company's increasing RPO did not reliably indicate that such revenue was effectively locked in. Instead, major operational, execution, and financing obstacles prevented Oracle from converting its AI infrastructure investments into revenue on the timeline Defendants represented, including: (i) Oracle lacked the ability to timely convert its AI-related CapEx into revenue or to reliably forecast when that revenue would materialize; (ii) Oracle faced pervasive execution

deficiencies that prevented it from timely delivering operational AI infrastructure capable of satisfying its contractual obligations; and (iii) Oracle lacked the financial capacity to fund the infrastructure build-out necessary to satisfy its RPO without assuming extraordinary debt and exposing itself to increasing negative free cash flow ("FCF").

91. Additionally, despite the Individual Defendants' reassurances to the contrary, accounts of FEs establish that, by virtue of regular reports provided to them and full access to comprehensive internal data management systems that provided visibility into expenditures, sales statistics, infrastructure project status, and financial projections, the Individual Defendants understood (or recklessly disregarded) the stark discrepancy that existed between their representations and any near-term ROI for investors in the form of recognized revenue for the massive AI-related CapEx that Oracle was undertaking.

### 1. Defendants Knew Oracle Could Not Rapidly Turn Its AI-Related Expenditures Into Revenue "Right Away"

#### a. Defendants Glossed Over Known Obstacles They Faced In Delivering Operational Data Centers

92. Interviews with FEs establish that Oracle lacked the ability to timely build, deploy, and operationalize the AI-related infrastructure necessary to generate substantial near-term revenue Defendants repeatedly promised to investors.

93. For example, FE-1 explained that to book revenue, a data center needed to be up and running, and needed to have the capacity, including computational capacity, to meet the computational needs of a particular customer. Although at the start of the Class Period, Oracle had operated data centers with computational capacity to meet the needs of traditional cloud workloads and traditional AI, generative AI requires dramatically more computational power than traditional AI models.

94. Bringing an AI data center online required Oracle to adapt or construct facilities capable of meeting extraordinary power and cooling demands, procure specialized equipment, and provide the skilled personnel necessary to install, test, and operate that equipment. FE-4 stated that a data center reaching full operational functionality was not just a matter of having the server up and connected, it also may require additional testing before and after transfer to a customer.

95. Accordingly, FE-1 stated that numerous operational dependencies had to be satisfied before Oracle could begin recognizing revenue—realities that Oracle glossed over in various earnings calls. For example, FE-1 explained that it was not just simply adding a few GPUs and racks to existing data centers. Oracle had to build new data centers because the old ones were tapped out. If a data center was built for OpenAI, for instance, OpenAI would have to get ready to deploy its technology and integrate it with Oracle's technology. According to FE-1, Oracle executives made it sound like the Company could just turn on a light switch and revenue would come, but in doing so, they really oversimplified the process. In FE-1's experience, it was not just a matter of turning on a light switch—you have to build the house, bring in an electrician, put in light fixtures and then sell the house. FE-1 stated that the entire process is a multi-year model.

### b. Oracle's AI-Data Center Development Was Plagued By Operational Failures, Delays, And Excessive Expenditures, And Regularly Resulted In Delayed And Insufficiently Functional Data Centers

96. Illustrating this issue, FE-2 explained that Oracle would frequently deliver data centers to customers that were not sufficiently functional due to attempts to meet unrealistic timelines. FE-3 corroborated that this happened consistently, estimating it happened ***50 to 75% of the time*** during his tenure (inclusive of the Class Period). For example, at the Abilene, Texas data center. FE-2 described that after delivery, these data centers required significant additional work to finally make them sufficiently functional. FE-3 described how Oracle would accelerate a data center's date of completion by as much as two months, and then handoff to a customer with

scheduled maintenance to fix issues that would require taking some of the newly installed equipment offline.

97. FE-2 stated that Oracle frequently handed over data centers to customers when the center was not fully complete—for example, when only 80% of the contracted capacity was ready. As FE-2 explained, 80% or even 90% capacity was an extraordinarily low number to declare being done, and well below Oracle's Service Level Objectives ("SLO") for his team. Additionally, according to FE-2, it was common in cloud services contracts in the industry for billing to be tied to actual capacity and for there to be penalties to the data center builder if they provided capacity that was lower than a certain threshold.

98. This practice was commonplace at Oracle. Data centers were routinely rushed to customers with the internal understanding that substantial additional work remained. For example, FE-3 described how, in early winter of 2025, Oracle rushed data center construction and configuration to the extent that all the cables were incorrectly set up and that work had to be completely reinstalled. Rushing to meet the deadline, FE-3 described how Oracle delivered the system incorrectly set up, with the express plan of carrying out maintenance in two weeks, which required a complete disassembly of the system.

99. Oracle executives were aware data centers were being delivered without sufficient functionality. Indeed, FE-2 attended weekly meetings during his tenure (inclusive of the Class Period) and at many of those meetings, he and SVPs informed EVP of OCI Mahesh Thiagarajan that the timelines were too aggressive and unrealistic, a characterization corroborated by FE-3. FE-2 observed that Thiagarajan responded that Oracle would manage the customer's expectations of the inadequate AI data centers after they were delivered. Per FE-2, in one instance, Thiagarajan knowingly pushed an AI data center in Batam, Indonesia to a rushed delivery in July 2025.

100. As a result, FE-2's GPU installation was forced to contend with 10-12 months of dust accumulation due to recent construction. The dust and dirt permeated into the network fiber optic links, making the data center insufficiently functional at the time of delivery. FE-3 corroborated this description of dirty workspaces, noting that, in some instances, he was told to mitigate a dirty work environment still under construction by simply covering the area in plastic. According to FE-2, the Batam data center was not sufficiently operational until the first week of September 2025.

101. Similarly, FE-2 stated that these issues arose in Oracle's data center in Abilene, Texas. Specifically, Oracle was in the process of handing over the first phase of the project to OpenAI in September or October 2025, but it was not fully functional because it was built in a construction zone, and Oracle had to resolve, among other issues, network link problems, caused by construction dust. The first phase of the data center did not become sufficiently operational until ***December 2025***. In particular, FE-3 corroborated this description, noting how Oracle consistently failed to follow industry best practices for data center construction based on arbitrary deadlines. For example, FE-3 described how Oracle performed migrations in data centers actively under construction, which introduced dust and dirt into the data centers' fiber optic network cables making the AI data center non-functional and requiring remediation, which caused further delays.

102. Rather than being deployed into revenue-generating AI infrastructure as Defendants represented, Oracle's CapEx were also frequently consumed by numerous other practical obstacles of the Company's own making. For instance, FE-8 stated that the Company wasted millions of dollars by overordering unneeded and incompatible equipment. FE-8 learned through his collaboration with counterparts in Texas that the Oracle facility there had a significant excess of unused, overordered, and incorrect equipment simply laying around at the data center.

103. Several FEs also described a "build it and they will come" approach within Oracle that similarly led to wasteful leases and misplaced and incompatible equipment. FE-12, for example, described Oracle, starting about two years ago in 2024, building out data centers to support the transition of customers' on-site servers to Oracle's servers. According to FE-12 when Oracle built out nineteen data centers all over the globe and told customers what it would cost for Oracle to host the data, Oracle was only successful in utilizing three of these facilities. Likewise, FE-4 explained that Oracle sometimes leased entire co-location data centers in anticipation of future demand, where at the time of signing the lease, the Company only had business lined up to justify building out a few rooms.

104. Leading up to the Class Period, the practice of building out data centers without a concrete corresponding revenue stream similarly played out in Oracle's government contracts. Specifically, FE-13 and FE-14 both described Oracle having to close facilities after it learned it was not awarded the contracts for which it had built the center. According to FE-13 this led to the added time and expense of shipping unused equipment to new locations.

105. Indeed, the adoption of the pre-contract datacenter build out strategy could be traced back to the highest levels of management at Oracle, as FE-12 explained, the "build it and they will come" theme was touted by Oracle's C-Suite executives at town halls and quarterly review meetings.

106. The C-Suite also was aware that Oracle was spending significantly on design changes unrelated to revenue-generating contracts with booked customers. For example, FE-7 observed, during the ordinary course of his job as a Principal Designer, that data center CapEx increased in part due to numerous design changes being made during construction. FE-7 explained that the cost of a room in a data center could double as the results of a design change, so a room

costing €1,000,000 EUR could balloon in price to €2,000,000 EUR. In fact, FE-7 stated that the design changes he witnessed in 2024 and 2025 were not made to accommodate existing customer needs, but instead were for either new customers, or no customer at all, resulting in billions of dollars in additional CapEx. FE-7 explained that all design changes were approved by EVP Thiagarajan, who reported directly to Defendants Ellison and Magouyrk.

c. Other FEs Confirm Oracle Experienced Significant Delays In Its Infrastructure Build-Out And That The Requisite Timelines It Represented Were Not Feasible, And Defendants Had Access To Information Showing The Same

107. Additional FEs confirm that shortly before and during the Class Period, Oracle was failing to timely deliver the necessary AI-related capacity to promptly generate revenue and that Defendants knew or had access to information reflecting as much.

108. According to FE-9, by 2024 concerns regarding Oracle's shift from being a 50-year-old software company to building AI data centers as fast as possible were obvious. FE-9 stated a red flag was Oracle C-Suite's lack of background and capabilities to put this AI focus to market, and the planning was very poor. They simply didn't know how to properly apply and adapt the new AI technology or monitor it. FE-9 described that Oracle was trying to compete with the likes of Google and Amazon when it could not, and it failed to re-engineer the company like those firms had done. He noted that it was a fallacy on Oracle's part to think it could transform the tremendous CapEx spending into revenue. FE-9 also noted the contradiction in Oracle laying off AI-related positions while trying to build its AI footprint.

109. During the Class Period the reality of Oracle's inexperience and inability continued to manifest. For example, FE-4 stated that he was aware that Oracle's first AI data center infrastructure project in Texas was behind schedule and supposed to have opened in 2025. As Oracle's first fully owned data center infrastructure project, FE-4 noted that doing a build-out of

this scale was like going from zero to a thousand.

110. As FE-4 personally observed during his in-person work on Stargate in late 2025 and early 2026, by the time he stopped working for Oracle in April 2026, the company was approximately 10 months behind schedule.

111. FE-4 explained that, despite Oracle's stated goal to build the Stargate data center in six months, there was absolutely no way that could occur as it was an impossible and insane timeline for the Company. According to FE-4, while it may have been possible for one of Oracle's more-experienced competitors, for Oracle, even in the case of a co-location (i.e., where Oracle leased space in an existing building—unlike Stargate), a six-month timeline to get the data center ready to deliver the needed capacity, would have been fast.

112. Indeed, as detailed above, FE-2 stated that Oracle was only able to begin handing off the first building of the project Stargate data center in September or October 2025, but it still was not sufficiently functional until December 2025. According to FE-2 similar issues occurred as Oracle attempted to deliver the second and third buildings in Abilene.

113. Oracle's upper-level management understood what was necessary to complete these large-scale projects and was kept apprised of project milestones through regular reporting. FE-6 stated that every director and vice president at Oracle was required to create Critical Project Reports, or CPRs, which indicated where their critical projects were in relation to important milestones. Per both FE-6 and FE-2, CPRs were aggregated and collated on a weekly basis for Oracle's SVPs, CFO, and CEO(s). FE-6 explained that, in 2025, all datacenter projects would have been reported on and included in the weekly CPRs and ultimately sent through the SVPs and EVPs to, among others, Defendant Magouyrk as co-CEO. FE-2 confirmed that the CPRs would include the progress of AI data center build outs and when goals were either delayed, and even included

Jira statistics on how many server racks were completed that week. FE-6 himself submitted his CPR first to SVP Rajesh Viswanathan, then to EVP Mahesh Thiagarajan, and then to the CEO. Similarly, FE-2 would submit his Critical Project Reports to EVP Thiagarajan, who would compile various CPRs into a single report for Magouyrk. FE-6 noted that much of the CPR reporting to Oracle senior management was done through the Confluence platform, but in 2025 was migrating to Sharepoint.

114. FE-6 noted his CPRs were mainly related to the storage needs and other critical areas for Oracle's biggest customers, whose storage needs he was responsible for addressing, including OpenAI, X, TikTok, NVIDIA, and others. Likewise, FE-2 stated that he reported on mitigation details for some of the problems and delays he encountered.

115. FE-2 further stated that Oracle executives, including Defendant Magouyrk and EVP Thiagarajan, routinely met and discussed problems and delays with AI data center infrastructure projects. FE-2 explained that he attended weekly meetings throughout his tenure where he would personally update Thiagarajan on the progress of AI data center projects, including the status of all delays and missed deliveries of functional AI data centers. Indeed, FE-2 directly informed Thiagarajan that the data center build-out timelines were unrealistic, but Thiagarajan would reply that Oracle was not going to miss the delivery date and they would manage customer expectations of non-functioning data centers following delivery. According to FE-2, Thiagarajan would, in turn, brief Magouyrk on the status of projects. FE-2 stated that during his tenure, he would occasionally also take part in meetings with Magouyrk where Magouyrk was briefed on AI data center projects.

116. Defendants were further aware of the ongoing infrastructure build-out status and needs by virtue of the OCI Cost Dashboard, in which the Company monitored spending. Program

Manager FE-5 led the development of the OCI Cost Dashboard, which provided Oracle employees with the current costs of data center hardware, such as the total cost for any server rack in Oracle's portfolio, including racks that were custom built for specific customers.

117. More specifically, FE-5 explained that the OCI Cost Dashboard showed all the costs associated with hardware, including product costs, shipping costs, and taxes. FE-5 described that the OCI Cost Dashboard could give cost breakdowns as granular as the cost for all the network gear, power, and the rack itself. FE-5 further explained that the OCI Cost Dashboard also tracked costs as far as 12-36 months in advance.

118. Per FE-5, OCI created a monthly snapshot of the cost data and ran a report from the OCI Cost Dashboard at the beginning of each month.

119. FE-5 stated that the OCI Cost Dashboard pulled from several internal Oracle data sources, although 90% of the data came from Supply Chain Operations, which tracked costs from suppliers as well as lead times for products.

120. FE-5 described how the OCI Cost Dashboard was used by Oracle employees, including upper-level management. FE-5 explained that product analysts within OCI Finance, the primary users of the OCI Cost Dashboard, would use the tool to track costs for all the hardware products in their portfolios, as well as the costs associated with shipping and receiving components to a given data center. Per FE-5, the product analysts relied on the information on the OCI Cost Dashboard to create their margin models. For example, FE-5 noted how an analyst could look in the OCI Cost Dashboard for the current and future costs for specific data storage racks.

121. FE-5 stated that upper-level management used the dashboard as well, Per FE-5, on numerous occasions he had to give demonstrations and tutorials to OCI Finance upper management on how to navigate the OCI Cost Dashboard. FE-5 further stated that he would often

be looped into conversations to guide management on how to access information about specific racks on the OCI Cost Dashboard. FE-5 recalled that he gave demonstrations on the OCI Cost Dashboard to individuals as senior as the SVP of OCI Finance.

122. FE-5 stated that the OCI Cost Dashboard was also used to brief other OCI Finance executives. For instance, FE-5 explained that the entire OCI Finance division had mandatory quarterly meetings, the Quarterly Margin Reviews, where FE-5 and his supervisors would provide high-level updates on actual and forecasted changes to hardware costs, such as developments in the current and anticipated prices of memory. Also, on a more granular level, each product analyst would walk through cost changes in their portfolios, which were built based on the OCI Cost Dashboard. FE-5 stated that the Quarterly Margin Reviews were attended by the SVP of OCI Finance.

123. FE-6 further stated that he provided input through the OCI Cost Dashboard if, for example, a new storage capability was realized, or if something changed the power per rack or capacity calculation.

124. According to FE-13, Oracle also used a software program called Jira for equipment requests, which provided executive management with awareness of equipment and CapEx needs. As FE-13 stated, equipment procurement requests for U.S. government data centers would be processed through the Jira software. Per FE-13, data center employees, operators, and managers created tickets requesting the desired equipment. FE-14 similarly stated that Jira, which was accessible to all Oracle employees, would be used on all data center projects to track every piece of equipment that was used for the data center project.

125. Likewise, FE-8 confirmed that quarterly reports that tracked data center infrastructure project costs, including details on sales orders and procurements tied to specific

projects, went all the way up to Oracle's C-Suite. FE-8 explained that the quarterly reports and purchase orders were accessible through Jira and were distributed via email. Per FE-8, although there were differing levels of access, everyone at Oracle had access to Jira.

126. FE-4 corroborated Oracle's use of Jira to track projects, noting that Oracle's main ticketing system to track troubleshooting work was Jira, although another customer solution was also used at the Abilene, Texas site. FE-14 also described use of the system to prove to supervisors that equipment or items were ordered by showing the supervisor the Jira ticket. FE-2 further explained that Jira tickets were used to track the final stages of data center build out projects from the time that GPU racks were powered for the first time, through stress testing, and until final delivery to the customer.

127. According to FE-13, Oracle also made use of a software called Fusion to organize orders from external vendors and Fusion provided executive management knowledge into the expenses required to outfit the data centers.

128. As described above, per FE-13, when the cost of a procurement request exceeded $100,000, Defendant Ellison would need to sign off on it—a requirement that was memorialized with a notice on Fusion. FE-13 stated that employees would receive a notification confirming Ellison's approval of such requests.

#### d. Defendants Knew That Significant Operational Obstacles Prevented Oracle From Rapidly Converting Its AI-Related CapEx Into Revenue

129. Further, shortly before and during the Class Period, Oracle faced substantial operational obstacles to bringing AI data centers online, including a lack of experience and know-how in constructing facilities of this scale and complexity, securing power, managing remote locations, and procuring specialized equipment that was subject to supply-chain delays and rapid technological obsolescence. Indeed, FE-2 confirmed that issues with construction, power, and

cooling repeatedly caused delays at most of Oracle's AI data center projects. FE-3 noted that at least one customer was concerned that data centers were so delayed in construction that the required computer chips would become obsolete during the construction process, requiring replacement chips and leading to delays in delivering on booked contracts.

130. These operational headwinds and failures additionally rendered materially misleading Defendants' repeated representations that Oracle could rapidly convert its AI-related CapEx into operational, revenue-generating infrastructure, including Defendant Magouyrk's assurances that the costs and effort associated with ramping up new data centers were "minimal."

131. Fundamental operational obstacles and shortcomings prevented Oracle from bringing AI infrastructure online on the timetable represented to investors, as illustrated by Oracle's experience with Stargate in Abilene, Texas. FE-4 was part of the so-called surge team of employees that traveled to Abilene, Texas in response to the Company's call for all hands on deck to assist with Stargate in 2025. In this role, FE-4 was responsible for performing troubleshooting to help resolve issues with non-functional data center servers, cables, and connections. FE-4 stated that the Abilene project was the first time the Company had built its own data center to support AI, which used a lot more servers than a traditional Oracle data center.

132. FE-4 explained that Oracle faced shortages of manpower capable of dealing with technical issues and, as a result, had to fly employees in from all over to help, which is how he became part of the Texas surge team. FE-3 corroborated this account, noting that employees were flown to data centers to complete work. FE-3 described this urgent need as problem of its own making and a function of Oracle's inability to follow its own procedures in pursuit of unrealistic, accelerated timelines. FE-3 estimated that this extra manpower cost Oracle up to several hundred thousand dollars per data center.

133. Oracle's inexperience constructing and equipping AI data centers capable of supporting generative AI workloads was compounded by other significant power, logistics, and staffing challenges. Specifically, FE-4 explained that Oracle needed to integrate with Texas' separate power grid, which required developing a remote power source and redundancy system. Likewise, FE-2 explained that Oracle used a unique natural gas power source that frequently failed to reliably power and cool the data center. Moreover, as FE-4 described, the remote location made procuring the equipment and staffing even more difficult, while supply chain delays and shortages of basic materials, including fiber optic cables, further impeded construction.

134. Oracle's competitors were far more adept and swifter at these AI infrastructure build outs. For example, FE-4 remarked that, unlike Oracle, Amazon could build similar data centers from dirt to up and running in approximately ninety days due to substantial experience doing so. FE-4 added that none of his fellow workers thought Oracle's six-month timeline for the Texas data center was feasible.

135. Oracle also faced hurdles regarding the energy consumption of AI datacenters. Per FE-11, as Oracle increased its AI service offerings, the data centers that provided shared services, both AI and non-AI cloud services, saw performance degradation. As FE-11 explained, the AI chips consumed so much energy that the shared portion of the infrastructure could not keep up with the hardware and scale needs.

2. Defendants Knew That Growing RPO Did Not Reliably Predict Near-Term Revenue Including Because Oracle Lacked The Ability To Timely Perform And Deliver On Its Obligations

136. Defendants were aware (or recklessly disregarded) during the Class Period that RPO represented performance ***obligations***, which Oracle was required to perform prior to the receipt of revenue, and which Oracle broadly lacked the capacity to deliver on the timelines it represented.

137. Thus, while Oracle repeatedly represented that its AI-related CapEx would rapidly translate into growing revenue and touted its growing RPO as evidence that such accelerating revenue was effectively locked in for coming years as well, increasing RPO instead partially reflected Oracle's growing inability to timely satisfy its contractual obligations. As Oracle increasingly disclosed and deployed significant CapEx on data centers and AI hardware—massive outlays that were necessary for it to be able to deliver on the contracted RPO—a critical question became *when and even if* the revenues implied by Oracle's ballooning RPO numbers would be recognized. Until it started to receive actual payments in significant amounts, Oracle's CapEx activities would require it to strain FCF and carry substantial credit risk.

a. Defendants Knew Oracle's Soaring RPO Was Subject To Significant Execution Deficiencies And Counterparty Risks Making It An Unreliable Barometer For Revenue

138. As explained above in Section V.B.1., according to FE-1, while Oracle created the impression that Oracle could quickly equip a data center and the revenue spigot would immediately begin flowing, even where Oracle had executed contracts reflected in reported RPO, the Company often lacked the capacity to timely perform those contracts and lacked experience executing such large deals and building out large data centers. Accordingly, touting RPO in this fashion was a risky move by Oracle, according to FE-1.

139. FE-1 further explained how growing RPO often reflected revenue that Oracle could not recognize in the current reporting period due to its own performance delays. Where Oracle had contracted to deliver and recognize revenue in a particular quarter, but was unable to deliver the associated portion of the quarterly revenue, that revenue would instead be added to RPO. Thus, increasing RPO could not only be an indication of a growing pipeline, but also of a growing backlog.

140. As FE-6 explained, every quarter Oracle reported escalating RPO, it boiled down to delivering data center capacity, which Oracle could not do. He stated that the whole process of data center construction was very immature, and Oracle just could not deliver the data centers to house the GPUs in a timely fashion.

141. Accordingly, the question around RPO was both *when* Oracle would be able to transform its RPO into recognized revenue, and *whether* Oracle would be able to do so at all.

142. Translation of RPO into revenue was also subject to significant and concentrated counterparty risk. FE-10 stated that Oracle maintained a sales dashboard that measured the progress of deals on a scale of 1 to 10, with 1 representing that talks had just started. The number would increase based on how likely a deal was to its close. The dashboard allowed users to see deal status and to determine customer concentration. According to FE-10, the dashboard showed that, as of the Fall 2025, OpenAI and Meta combined for more than half of Oracle's sales revenue.

143. Oracle not only faced the risk that it would be unable to timely perform its own contractual obligations, but also the risk that its concentrated counterparties would fail to perform theirs, including by failing to fund or honor their commitments. These risks were known throughout the Company. As FE-9 stated, it was a common joke at Oracle whether OpenAI would ever be able to make payments on their contracts, as OpenAI's CEO, Sam Altman, was known to suddenly change his mind and back out of deals. Per FE-9, Oracle's upper management was consistently assuring employees that everything would work out and that the OpenAI contract was a great deal.

#### b. Defendants Knew Oracle Could Not Reliably Forecast When Its AI-Related CapEx Would Translate Into Near-Term Revenue

144. Despite the numerous operational, execution, and financing headwinds Oracle faced in timely constructing and bringing AI data centers online, the Company repeatedly

represented that its AI-related CapEx would rapidly translate into substantial near-term revenue. However, FE-1 stated that, historically, Oracle had never forecasted its business around CapEx, and therefore lacked the experience and institutional expertise to reliably forecast or budget after transitioning to an AI infrastructure business driven by unprecedented CapEx. For example, according to FE-1, his finance team was uncertain how long it would take to get a data center online or how revenue recognition would work. Indeed, FE-1 indicated it could take another 10 years to recognize all the revenue that was in RPO. FE-12 corroborated FE-1's conclusion, noting internal speculation at Oracle that the AI datacenters would not see any significant revenue return until 2030.

145. FE-1 further explained how Oracle's AI build-out also vastly differed from its traditional, organic business—specifically in terms of its reliance on large, whale-sized bookings. Per FE-1, Oracle's traditional business had stemmed from software customers of various sizes and was slower to grow but not reliant on large bookings to make expected numbers. Importantly, in Oracle's traditional software business, FE-1 stated that the Company relied on revenue from recurring software sales and software license renewals across many customers—the Company was more easily able to forecast revenue for this reason. Oracle's AI infrastructure business, in contrast, relied on fewer huge whales—or enormous bookings—every quarter.

146. With large AI deals, however, unlike traditional software business, FE-1 explained that booked work came with custom schedules that required Oracle to deliver on a pre-determined timeline, with revenue recognition dependent on Oracle's ability to build capacity in accordance with the schedule. For example, FE-1 described how large, booked deals were divided up into a quarterly schedule of potential recognized revenue. If performance obligations held up that contracted work, then it could not be recognized as revenue, and would be rolled up into the RPO

figure. FE-1 described how the Abilene, Texas data center repeatedly missed its completion milestones and how the costs of building it had risen significantly. FE-1 noted that Oracle was not delivering on the timeline set forth in the contract.

147. This not only created a potential obstacle to corresponding ROI for investors in the form of recognized revenue but also exemplifies how these large deals fundamentally were different than Oracle's traditional business models and rendering it difficult to predict conversion of CapEx and RPO to recognized revenue.

148. FE-1 stated that his team felt that Oracle was merely constructing a house of cards. Indeed, FE-1 described the departure of Defendant Catz—Defendant Ellison's right-hand confidant with intimate knowledge of the Company's finances and operations—as indicative of a problem.

c. The Individual Defendants Had Direct Visibility Into Oracle's Inability To Timely Convert Its AI Investments Into Revenue

149. The Individual Defendants had direct visibility into Oracle's ability to perform the contractual obligations underlying its growing RPO and recognize the associated revenue on the near-term timeline represented to investors both through the data sources already noted and through their access to centralized platforms containing comprehensive sales and financial data.

150. For example, Oracle maintained and made available to Oracle employees a centralized data platform, Global Business Analytics ("GBA"), formerly called Sales Intelligence ("SI"), held by the Global Business Finance group and hosted on OCI. As FE-1 explained, GBA, previously SI, was the largest single platform at Oracle for data and analytics, containing virtually all the data at Oracle, including finance, sales, marketing, and, as of the last two years, HR data. FE-1 stated that a team he led within Global Business Finance maintained this centralized GBA

platform. As described by FE-1, this platform was accessed by vice president level and above, and in a given month, approximately 25,000 Oracle employees would access the system.

151. Specifically regarding senior management, FE-1's group would provide weekly, customized reports to the C-Suite, including a weekly black book or control book that would be delivered directly to Defendants Catz and Ellison each Friday, containing analysis of Oracle's sales pipeline. FE-1 stated that this was the most important deliverable generated by his team to the C-Suite. The core team responsible for providing this information to the C-Suite was the Executive Production Services ("EPS"), which was part of FE-1's larger Global Business Finance team.

152. To deliver this reporting to the Individual Defendants, FE-1 described that his team would review Oracle's sales pipeline and historical conversion rates and predict where they would land for the quarter in terms of bookings. He further explained that another finance team would apply the information his team provided to estimate global bookings and revenue recognition in the quarters to follow.

153. FE-1 explained that there was a special Excel format that had been used at Oracle for approximately thirty years that Defendants Ellison and Catz preferred. FE-1 added that Ellison, who did not like graphs or anything visual, preferred everything presented in rows and columns in a spreadsheet with a particular font and color combination, referred to as Oracle Red.

154. FE-1 also stated that his team would provide executive analytics to the C-Suite on various other topics, including quarterly win-loss analyses and competitive benchmarking on a quarterly basis. Competitive benchmarking assesses the success rates of corporate sales and revenue strategies. FE-1 explained that the competitive benchmarking would be informed by earnings calls of Oracle's competitors. Based on this information, FE-1's team would construct

financial models to project Oracle's revenue per region and then compare the projections to Oracle's actual bookings growth.

155. Per FE-1, his team would also create P&L budgets, prediction of revenue over time, and financial analyses for marketing, sales, and HR.

156. Oracle executives also received regular reports regarding booked contracts and how those concrete bookings compared to the ROI for investors from CapEx spending—recognized revenue. For example, as described by FE-1, the C-Suite received on a weekly basis a direct statement of what contracts Oracle had in fact booked, and how that number stacked up to what Oracle could recognize as revenue for the quarter—the ROI for investors from the CapEx spending. As such, the Individual Defendants had visibility into work that was stuck in a backlog and what bookings were paying off in near-term revenue.

157. Senior management also had visibility into spending for the data center buildouts. FE-13 explained Oracle's Fusion system required that orders of hardware exceeding certain amounts be approved by a director, senior director, VP, SVP, or even, for orders over $100,000, Defendant Ellison.

158. FE-1 shared his concerns regarding RPO being an unreliable predictor of future revenue with those in leadership on his team who similarly had concerns regarding the stock rising based on the RPO number. FE-1 also warned his management, including SVP of Revenue Operations Tom Germack, about RPO in fact reflecting a liability to the Company.

3. Defendants Knew Oracle Lacked The Financial Capacity To Fund Its AI-Infrastructure Build-Out

159. FEs, including several in management roles, establish that Oracle closely tracked its AI infrastructure capacity, CapEx, and available financial resources. As a result, Defendants knew—or recklessly disregarded—that throughout the Class Period (absent a huge funding raise)

Oracle lacked the financial capacity to fund the infrastructure build-out necessary to satisfy its growing contractual obligations and generate the accelerating near-term revenues repeatedly represented to investors.

160. For example, FE-11 noted that Oracle was trapped in a circular development cycle. According to FE-11, Oracle had a backlog of AI datacenter contracts, but did not have the capital necessary to meet it. In other words, Oracle needed the revenue from its AI datacenters to finance the very same datacenters required to generate that revenue.

161. Oracle's cash constraints were also evident internally. FE-11 explained that as of September 2025, his workflow, which was based upon Oracle's business contracts, dried up. Additionally, FE-5 recalled that both a Vice President of Oracle Cloud Finance and an SVP of Oracle Cloud Finance stated that there was a lack of cash available as a result of the massive spending on the AI data centers.

162. Facing mounting cash constraints, Oracle undertook significant layoffs in an effort to free capital for its AI infrastructure build-out. FE-10 noted that there was internal discussion within the Corporate Events group about Oracle's cash shortage and increased layoffs. FE-10 described that the layoffs included the Head of Applications Rod Johnson and EVP of Revenue Operations Jason Maynard. FE-10 stated that, in 2025, the Company continuously rearranged working groups while cutting employees and budgets, all in the name of the AI transition. Likewise, FE-15 stated that Oracle instituted massive layoffs, travel cuts, and delayed hiring as a result of the huge CapEx spending and risky outstanding debt being incurred for AI datacenters. FE-12 Similarly attributed layoffs to the need to cut costs. Beyond large cuts in August and September 2025, over the course of FY26, Oracle cut nearly 13% of its workforce, further

exacerbating the shortages of skilled manpower needed to convert Oracle's mounting CapEx into the near-term revenue Defendants repeatedly promised investors.

### C. Throughout The Class Period, Defendants Assured Investors That Significant CapEx Would Lead To Near-Term Revenue Growth And Was Justified By Locked-In Future Revenues Proved By Ballooning RPO

#### 1. June 11, 2025: Defendants Announce Q4 2025 Financial Results And Assure Investors That Revenue Would Swiftly Follow Swelling CapEx

163. During the Class Period, which begins after 4:05 PM ET on June 11, 2025, Defendants misled investors by repeatedly assuring the market that: (i) Oracle's unprecedented AI-related CapEx would rapidly translate into substantial near-term revenue growth because it was being deployed into operational, revenue-generating AI infrastructure; (ii) the resulting revenue and Oracle's present cash would fund the continued expansion of the extensive AI infrastructure necessary to satisfy Oracle's growing contractual obligations; and (iii) Oracle's ballooning RPO was proof that substantial future revenue was effectively locked in. These misrepresentations began with Oracle's announcement of Q4 FY25 financial results.

164. After markets closed, at 4:05 PM ET, on June 11, 2025, in a Press Release announcing Oracle's fourth quarter fiscal year 2025 financial results, Defendant Catz represented: "[W]e believe FY26 will be even better [than fiscal year 2025] as ***our revenue growth rates will be dramatically higher***. . . ." Likewise, Defendant Ellison stated that "***[w]e expect OCI consumption revenue to grow even faster in FY26. OCI revenue growth rates are skyrocketing—so is demand***."

165. During the June 11, 2025 earnings call held at 5:00 PM ET, Catz announced that, for FY25, Oracle's FCF was "negative $400 million," and CapEx had risen to $21.2 billion (from $16 billion anticipated in March of 2025). However, Defendants assured investors that Oracle's increasing AI-related CapEx would rapidly translate to strong revenue growth and "rais[ed] [its]

revenue guidance for fiscal year '26 to over $67 billion," one billion more than previously announced.

166. In prepared remarks, Defendant Catz stated that RPO had risen to $138 billion, "up 41% from last year, and yet the best is still to come." Catz further remarked that "OCI has seen exceptional demand for infrastructure services and ***those contracted noncancelable bookings in RPO***" gave Defendants "***confidence that OCI revenue will grow over 70% this current year***."

167. Catz also announced that Oracle's CapEx for FY26 had increased and would now be "***over $25 billion as we work to meet demand from our backlog***." At the same time, she assured investors that those CapEx would rapidly begin generating revenue and profits, asserting that: ***"[t]he vast majority of our CapEx investments are for revenue-generating equipment that is going into data center***s"; "***[a]s we bring more capacity online, our revenue and profit growth will further accelerate***."

168. In response to a Melius Research analyst's request for "more color" on what the CapEx—which was "much higher than expected . . . $5 billion more than we expected to get to the $21 billion"—was spent on, and an explanation of how it would "help[] [Oracle] yield more revenue," Defendant Catz emphasized that Oracle's spending increase was made to meet present, pending demand, not in hopes of attracting it: ***"[W]hen we all of a sudden have higher CapEx, it means we are filling out data centers and we are buying components to build our computers*, *which are different than other people, and we are putting them on the floor.*** We had an opportunity to buy up and for deployment, and so we did, and we are putting out as much capacity as we possibly can as quickly as we can."

169. Catz likewise responded to a Guggenheim analyst asking for "color beyond Stargate to help [investors] get [their] heads around those massive growth numbers," referencing

language in Oracle's press release regarding FY26 growth. Catz responded that Oracle had "so much in pipeline right now . . . ***and of course, we have so much in RPO, meaning those are noncancelable contracts***."

170. Defendant Ellison underscored that CapEx increased to meet significant demand: "CapEx is going to go up because the demand right now seems almost insatiable. I mean I don't know how to describe it. I've never seen anything remotely like this."

171. The next day, on June 12, 2025, in response to Defendants' statements, Oracle's common stock price hit a record high, surging by 14% to reach the $200 mark for the first time.

172. Analysts reported on Defendants' statements about accelerating revenue from CapEx. For example, on June 11, 2025, BNP Paribas analysts repeated Oracle's claim that its large CapEx spend was linked "directly" to revenue generation: "Management also provided FY26 capex guidance of $25bn+ (with the potential to skew upwards) as Oracle's capex spend is largely focused on server equipment rather than long-lived assets (i.e. capex directly ties to revenue generation)."

173. On June 18, 2025, Oracle filed its Fiscal 2025 Annual Report on Form 10-K, signed by Defendants Catz, Ellison, and Smith. Although Oracle would, three few months, issue an enormous bond offering to finance its AI-infrastructure build-out, the Form 10-K touted Oracle's ability to meet its current CapEx needs with its present cash and borrowing arrangements: "We believe that ***our current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our working capital, capital expenditures and contractual obligations requirements***." Additionally, the Company identified a $43 billion increase in data center lease commitments, disclosing "$43.4 billion of additional lease commitments, primarily for data centers, that are generally expected to

commence between fiscal 2026 and fiscal 2028 and for terms of ten to sixteen years that were not reflected on our consolidated balance sheet as of May 31, 2025 or in the maturities table above."

174. Also in the June 18, 2025 10-K, Oracle provided disclosures of purportedly contingent "Business and Operational Risks," stating for example, "***[i]f we are unable to secure data center capacity at affordable rates or do not accurately plan for and manage our infrastructure capacity requirements, our profitability may decline.***" Oracle further represented, "***[o]ngoing or future delays or the inability to meet customer demand could cause the loss of additional sales, delay our revenue recognition or increase our costs, all of which could adversely affect the margins of our business***." While Oracle described these circumstances as hypothetical and not yet having come to pass, Oracle already knew it was experiencing widespread delays and operational failures in bringing AI data centers online.

175. On June 18, 2025, BNP Paribas analysts described Oracle's "[i]mpressive growth set to come through," specifically noting "Oracle's impressive AI momentum as well as its under-appreciated cloud migration story across both infrastructure and applications." Further, the analysts embraced Defendants' representations, and explicitly linked Oracle's CapEx to near-term revenue growth: "FQ4 capex is tied to 70%+ OCI growth in FY26."

176. Then, on June 30, 2025, Oracle filed a current report on Form 8-K, representing: "Oracle is off to a strong start in FY26. Our MultiCloud database revenue continues to grow at over 100%, and we signed multiple large cloud services agreements including one that is expected to contribute more than $30 billion in annual revenue starting in FY28."

177. On this announcement, Oracle's stock price surged to another all-time high that same day.

178. Analysts again cheered Defendants' representations. For example, on June 30, 2025, BuySellSignals described how Oracle's elevated RPO was increasing investors' confidence in its ability to swiftly generate revenue, stating, "[Oracle's] record $138 billion RPO is seen as a robust indicator of predictable future revenues. This backlog highlights Oracle's effective acquisition of large enterprise contracts, boosting confidence in its ability to meet fiscal 2026 revenue targets." That same day, Guggenheim analysts reiterated their "buy" rating and remarked that Oracle's $30 billion dollar deal announcement "de-risks near-term RPO expectations."

179. On July 22, 2025, Oracle announced more details of the $30 billion dollar deal mentioned on June 30, disclosing that it was a deal to build an additional 4.5 gigawatts (GW) of Stargate data center infrastructure in the United States. In OpenAI's statement on this announcement, it asserted that the agreement "significantly advances our progress toward the commitment we announced at the White House in January to invest $500 billion into 10 gigawatts of AI infrastructure in the U.S. over the next four years."

180. On July 22, 2025, Barclays analysts described this announcement as "supporting the narrative that numbers at ORCL are becoming too large for investors to ignore" and "***bolster[ing] Oracle's reacceleration story***," and maintained an "overweight" rating (signaling a view that the stock would outperform industry peers).

181. Defendants' repeated assurances that AI-related CapEx would rapidly generate revenue also served to address growing investor concern regarding Oracle's deteriorating cash flow and increasing leverage. For example, on July 28, 2025, Moody's Ratings ("Moody's") revised its outlook for Oracle from "stable" to "negative" based on an "expectation of continuing elevated leverage and increasingly negative free cash flow as Oracle materially ramps up its AI infrastructure business." Moody's opined that "[t]he cash flow shortfall is further exacerbated by

Oracle's very large existing debt obligations, meaningful dividend payments and core cloud business expenditures,"[1] and noted that none of its competitors building out AI infrastructure "are as leveraged or cash flow negative as Oracle entering into this phase."

182. At the same time that Oracle was engaged in significant CapEx, the Company laid off hundreds of employees in August through early September 2025. According to Bloomberg, the layoffs were part of Oracle "taking steps to control costs amid heavy spending on AI infrastructure."

183. Despite these layoffs and potential concerns, analysts remained confident in Oracle's ability to generate revenue in the current and coming fiscal year based on Defendants' representations. For example, on September 5, 2025, Guggenheim analysts stated that the market had "high visibility into FY26, FY27 Recurring Revenue," with "very high visibility *into at least 87% of the consensus FY26 recurring revenue and at least 73% of Total revenue, setting [Oracle] up well in any macro environment*." (Emphasis in original). Guggenheim noted that "Oracle discloses more granular information on RPO than any software company that we know of, yielding better visibility into the timing of future revenue," and citing Oracle's extensive RPO pipeline, wrote: "*we view Oracle's position of having to bring capacity online of previously signed contracts to recognize revenue (and drive growth) as more favorable relative to most others in Software that need to sign new business to drive growth*." (Emphasis in original).

2. <u>September 9-10, 2025: Oracle Announces Q1 FY26 Financial Results, Representing That Near-Term Revenue Would Follow CapEx Right Away, Touting $455 Billion in RPO, And Claiming It Would Have The Cash To Finance Necessary Operations And Expenditures</u>

184. On September 9, 2025, at 4:05 PM ET, Oracle issued a press release announcing its financial results for Q1 FY26. Tracking behind prior guidance that revenue would be up 16% on the year, total revenue during the quarter had increased by 12%. Nevertheless, Defendants

trumpeted that Oracle's RPOs had increased 359% to $455 billion, portraying the increase as confirmation that substantial future revenue was effectively locked in.

185. In the Press Release, Defendant Catz touted multiple customers and significant growth in OCI revenues: "We signed four multi-billion-dollar contracts with three different customers in Q1. . . . This resulted in RPO contract backlog increasing 359% to $455 billion. It was an astonishing quarter—and demand for Oracle Cloud Infrastructure continues to build."

186. Notably, Oracle also announced another dramatic increase in CapEx for FY26, which it disclosed would now be ***$35 billion***, up from $25 billion announced in just the previous quarter. It stated that Oracle had $8.5 billion in CapEx for Q1 FY26—more than triple the comparable prior year period—and a negative FCF of approximately $5.8 billion—compared to positive $11.3 billion FCF in the same FY25 period.

187. The September 9, 2025 Press Release did not specifically mention Oracle's approximately $67 billion FY26 overall guidance that Defendants had provided on June 11, 2025. But it did quote Defendant Catz stating that Oracle "expect[ed] Oracle Cloud Infrastructure revenue to grow 77% to $18 billion this fiscal year."

188. That same day, at 5:00 PM ET, during the accompanying earnings call, Catz stated: "***[F]iscal year '26 CapEx will be around 35 billion***," but emphasized that "***[t]he vast majority of our CapEx investments are for revenue-generating equipment that is going into data centers and not for land or buildings***." Catz asserted that, "***[a]s we bring more capacity online, we will convert the large RPO backlog into accelerating revenue and profit growth***." She added that "***[b]eyond fiscal year 26, I'm even more confident in our ability to further accelerate our top- and bottom-line growth rate***."

189. Catz again emphasized that near-term revenue would grow and then grow continuously from there, specifically for OCI: "We now expect Oracle Cloud Infrastructure will grow 77% to $18 billion this fiscal year and then increase to $32 billion and $73 billion dollars, $114 billion, and $144 billion over the following four years. Much of this revenue is already booked in our $455 billion [R]PO number. We are off to a fantastic start this year."

190. During the earnings call, analysts focused on the ever-increasing CapEx, and the Company's expected return. A Cowen and Company LLC analyst asked if Catz could "provide a bit more context on how much CapEx and operational cost structure will be needed to fully service these contracts" and "generally, how investors should be thinking about the ROI on the spend?"

191. In response, Defendant Catz asserted that CapEx would lead to increases in revenue ***"right away"*** and emphasized that Oracle's leasing structure allowed the Company to focus on purported revenue-generating equipment, such as hardware and infrastructure needed for the data centers: "***[W]e do not own the property. We do not own the buildings. What we do own and what we engineer is the equipment. . . because of that, what we do is we put in that equipment only when it's time and usually very quickly. Assuming that our customer accept[s] it, we're already generating revenue right away*** . . . What I have indicated is that CapEx looks like ***it's going to be about $35 billion for this fiscal year. But because we're monitoring this, we're literally putting it in right when we take possession and then, handing it over to generate revenue right away***." To sum up, Catz stated that "***we have a very good line of sight for our capabilities to put this out and basically to just spend on that CapEx right before it starts generating revenue***."

192. On the call, Defendant Ellison stated, "***we can deliver a lot of databases and a lot of AI across our cloud over the next several years***," and in response, a Wolfe Research analyst congratulated Oracle on the "very high-margin AI revenue."

193. Ellison highlighted the purported direct correlation between CapEx and rapid revenue generation: "[W]e just turned over a giant data hall to one of our customers. The acceptance time could have been as long as a couple of months. It was one week. It was one week from the time we officially owned the equipment and they were testing it to the time they started paying for it. One week***. So we have an extraordinary team that's doing an extraordinary job of making sure that we get the equipment working very quickly. And our customers can accept it, they want to accept it as fast as possible because they want to do the work, they want to train their models. And this one took a huge hall, took one week for acceptance***."

194. Both Defendants Ellison and Catz, in their comments to analysts, thus misleadingly underscored that Oracle's flood of CapEx was directly correlated to spending on equipment at a stage where installation of that equipment was imminently tied to revenue generation.

195. Analysts and investors broadly embraced these statements, looking past Oracle's negative miss on current earnings and revenue, instead noting Defendants' rosy representations about the Company's ability to deliver on near term revenue growth and realize RPO. For example, after the earnings call on September 9, 2025, MarketWatch reported that "Oracle's stock surges toward its best day since 1999. These huge numbers explain why. While the latest earnings and revenue numbers come up short, Oracle impresses with its talk of new multibillion-dollar deals and big cloud projections." UBS analysts maintained a "buy" rating and noted that despite the Company's Q1 results that "fell slightly short," "in our view it won't matter" because "[t]he scale of the backlog - $455b . . . is so materially above Street estimates and drives such a material upward revision to FY28+ estimates that the stock deserves to re-rate materially higher, ***turning Oracle into perhaps the biggest large-cap growth acceleration story in all of tech***."

196. On September 10, 2025, Oracle filed its quarterly report on Form 10-Q for Q1 FY26, signed by Defendants Catz and Smith. Therein, despite reduced FCF, Oracle again represented that it had enough cash on hand to meet its CapEx needs, stating in relevant part, "We believe that ***our current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our working capital, capital expenditures and contractual obligations requirements***." This report further disclosed "$99.8 billion of additional lease commitments, substantially all for data centers, that are generally expected to commence between the second quarter of fiscal 2026 and fiscal 2028 and for terms of ten to sixteen years that were not reflected on our condensed consolidated balance sheets as of August 31, 2025."

197. In the same filing, under the sub-heading "**Item 1A. Risk Factors**," Oracle directed investors to its June 18, 2025 FY25 Form 10-K, including the risk factors stated in ¶174, *supra*.

198. Upon the foregoing disclosures, on September 10, 2025, the Company's stock price leapt by almost 40% in a single day—reaching a record high and closing at $328.33 per share.

199. Defendant Ellison became the richest man in the world, with Bloomberg noting that Ellison's increase in wealth was the "biggest one-day increase ever recorded" by the Bloomberg Billionaire Index.

200. Following this announcement, analysts continued to look past subpar Q1 results to praise Defendants' assertions of accelerating revenue growth and related blockbuster RPO announcement. For example, on September 10, 2025, CNBC reported that "***Analysts are stunned by Oracle's cloud growth projections given in the company's first-quarter report, with many cementing the stock as an artificial intelligence frontrunner alongside the market's biggest tech giants. . . . Shares skyrocketed 30% in premarket trading Wednesday on the results***, putting

them on pace for their best day since dot-com boom of 1999. Oracle shares are up nearly 45% year to date."

201. Multiple analysts noted Oracle's representations regarding the direct connection between Oracle's CapEx and revenue growth and that revenue would rapidly accelerate and be felt "***right away***." For example, on September 10, 2025, Evercore analysts stated that "Oracle's OCI ***backlog acceleration is the key takeaway, reinforcing the company's call for faster revenue and EPS growth ahead***." Similarly, TD Cowen stated that the RPO numbers were "***game-changing***" for Oracle and that management "***raised FY26 capex guide from $25b+ to $35b+ which is virtually all for revenue-generating equipment***." UBS likewise reiterated that "***spending will be concentrated on revenue-generating equipment*** (servers/racks, GPUs, networking, liquid cooling, and data center infra) - ***rather than buildings***. Management highlighted that ***onboarding OCI customers translates into near-immediate revenue, validating high ROI on capex***."

202. In sum, analysts gave Oracle a pass on its disappointing quarterly revenue results and gushed that Defendants' disclosures regarding growing revenues and RPO indicated that Oracle had joined the top echelon of tech companies. BNP Paribas analysts wrote that, "With tonight's $500bn RPO guide, we believe that Oracle is now likely on its way to joining the 4 other hyperscalers (Alphabet, Amazon, Meta and Microsoft) with trillion $ + valuations." BNP Paribas analysts trumpeted the investment case for Oracle, asserting that they "continue[d] to ***see Oracle as one of the best ways for public market investors to capitalize on the growing success of major AI Labs and their insatiable appetite for GPU compute***." On that same day, TD Cowen analysts called the financial results "the most momentous QTR in ORCL's history," and stated "we believe no one competitor will be able to put a material dent in ORCL's leading market share anytime in the foreseeable future."

### 3. Oracle Continues To Deflect Investor Concern About The Risks Of Its Aggressive AI Infrastructure Spending Strategy, Amidst CEO Shake-Up

203. On the afternoon of September 10, 2025, the day after Oracle's announcements that led to a record-breaking stock leap, the *Wall Street Journal* ("WSJ") reported that Oracle's Stargate-related contract with OpenAI for $300 billion in computing capacity constituted nearly seventy percent of the $455 billion in RPO Defendants had announced on September 9, 2025. The article described the contract as a "risky gamble for both companies" because of Oracle's lack of customer diversification, and noted that OpenAI currently lacked capital stability: "OpenAI is a money-losing startup . . . [generating] less than one-fifth of the $60 billion it will have to pay on average every year."

204. The WSJ article also stated: "Oracle is concentrating a large chunk of its future revenue on one customer and will likely have to take on debt to buy the AI chips needed to power the data centers." It went on: "[c]ompared with Microsoft, Amazon and Meta, the biggest spenders of the AI age, Oracle has a far greater debt load relative to its cash holdings" with "Microsoft ha[ving] a total debt to equity ratio of 32.7% compared with ***427%*** for Oracle."

205. Despite this report, on September 12, 2025, Berenberg analysts concluded that "[w]e currently do not anticipate that OpenAI will experience funding challenges, especially after its agreement with Microsoft on 11 September, which could allow OpenAI to . . . become a public company."

206. Then, on September 17, 2025, Moody's published a report that addressed risks relating to Oracle's $300 billion OpenAI deal, while commenting that the contract showed "tremendous potential" for the Company's AI infrastructure business.

207. Similarly, on September 18, 2025, UBS analysts noted that, following the WSJ report, they had received "a host of investor questions—about the size and duration of the OpenAI

deal, how ‘real’ the reported backlog is, . . . the required capex, how Oracle will finance this investment . . . .” UBS acknowledged certain risks, including “OpenAI’s ability to honor the spending commitment that far out,” but reiterated that it was “confident in the go-live timeframe of Abilene . . . .”

208. Then, on September 22, 2025, Oracle filed a current report on Form 8-K, announcing that Defendant Catz was leaving the CEO post, which she had held for 11 years. Catz assumed the role of Executive Vice Chair of the Board of Directors. Defendant Magouyrk and Michael Sicilia were promoted to the roles of Oracle Co-CEO. In the Press Release, Magouyrk and Sicilia stated that they were “excited to lead Oracle into the AI era, where technological innovation leads to extraordinary business opportunity and hyper-growth". During this announcement, Oracle also reiterated its September 9, 2025 guidance for OCI revenue to grow 77% to $18 billion in FY26, which did not mention guidance for Oracle overall.

209. On a special investor call that same day, Catz addressed the abrupt announcement of her step-down, and framed it as reflecting a position of strength, rather than a need for strategy change or management shift. For example, Catz responded to a Guggenheim Securities analyst’s question regarding her future involvement in Oracle’s operations by asserting that “[y]ou want to make a transition like this when things are great. And when I'm handing it to two of the guys actually a whole team that have brought Oracle here, this is really—this is ideal.”

210. Defendant Ellison also commented on the leadership transition and its boosting of Oracle’s ability to bring “gigawatt scale data centers” to life.

211. Defendants also took the opportunity to emphasize Oracle’s speed in delivering infrastructure to meet contracted demand with Magouyrk stating, for example: “[W]e spend a lot

of our time working to say yes to those customers and give them the infrastructure they need as quickly as possible."

212. Following these statements, analysts expressed that they were reassured and remained confident regarding Oracle's ability to provide near-immediate ROI from its significant CapEx despite the management change and spending burden. For example, on September 23, 2025, Citizens analysts maintained their "outperform rating" stating, "While the company undergoes a transition in management and needs to spend CapEx dollars to convert RPO into revenue, and has a dependency on OpenAI and Nvidia (NVDA, NC), we continue to view the stock as an attractive opportunity for capital appreciation for several reasons, including: 1) Oracle has become the *'go-to place'* for AI workloads, with RPO increasing by $317B sequentially since last quarter . . . and while OpenAI's $30B per year deal certainly represents a big chunk, Oracle also called out deals with xAI, Meta, Nvidia, and AMD (AMD, NC) . . . [and] 4) CapEx is rising significantly, but Oracle's approach remains *'capital-light,'* as Ms. Catz explained that the company is focused on purchasing 'revenue-generating equipment' rather than buildings or land, and Mr. Ellison highlighted the speed of deployment, sharing that a major data hall was accepted and generating revenue just *'one week'* after Oracle took possession . . ." Thus, Defendants' claims that CapEx was spent on revenue-generating equipment close in time to receipt of that corresponding revenue reassured investors of the low execution risk of Defendants' AI strategy.

### D. The Truth Regarding Oracle's CapEx Strategy Is Gradually Revealed To The Market Through A Series Of Disclosures Showing That Expenditures Were Not Followed By Near-Term Revenue And Oracle Was Not Capable Of Supporting Its Obligations And Operations Without Taking On Significant Additional Debt, All While Defendants Continue To Mislead And Reassure Investors

213. Throughout the Class Period, Defendants concealed the true operational, execution, financing, and counterparty headwinds undermining Oracle's effort to become a leading AI

infrastructure provider through unprecedented AI-related CapEx. Instead, Defendants repeatedly assured investors that Oracle's escalating CapEx was being deployed into operational, revenue-generating AI infrastructure such that substantial near-term revenue would follow "right away." Defendants further represented that the resulting revenue and existing cash would fund Oracle's continuing infrastructure build-out and pointed to Oracle's dramatically increasing RPO as confirmation that accelerating revenue growth was effectively in place for years to come.

214. As detailed below, however, the market incrementally learned the truth regarding Oracle's actual circumstances through several partial corrective disclosures between September and December 2025. These disclosures revealed that Oracle lacked the ability to timely operationalize and finance the infrastructure necessary to satisfy its contractual obligations and generate accelerating near-term revenue as Defendants had repeatedly promised. Even as that truth began to emerge, Defendants continued to reassure investors and downplay mounting concerns regarding the return on Oracle's unprecedented CapEx investments.

215. By the end of the Class Period, following the final corrective disclosures in mid-December 2025, the market had learned Oracle's AI-infrastructure investments were not rapidly translating into near-term revenue growth. Instead, the Company faced significant operational, execution, financing, and counterparty obstacles to performing its contractual obligations. As the truth emerged, Oracle lost billions of dollars in market capitalization, causing substantial losses to investors.

1. <u>September 24 and 25, 2025: In The First Partial Corrective Disclosures, The Truth About Oracle's Inability To Turn CapEx Into Near-Term Revenues And The Extent Of Its Inability To Fund Its AI Infrastructure Build-Out Is Incrementally Revealed To The Investing Public Based On Oracle's $18 Billion Bond Sale</u>

216. On September 24, 2025, before the market open, Bloomberg reported that Oracle was issuing approximately $15 billion in corporate debt; within hours, reports noted that the full

amount of the offering was $18 billion. That same day, Oracle filed an SEC 424B2 Prospectus Supplement indicating that it would be selling bonds for "general corporate purposes" including, among others, "capital expenditures." Notably, some of the bonds would not mature for forty years—until 2065.

217. The offering was met with investor surprise and concern about the extent of Oracle's ongoing funding needs and the long-term duration associated with the bonds, which indicated heightened risk. For example, on September 25, 2025, at 9:19 AM ET, the Dow Jones Newswire reported that the "$18 billion raise highlights . . . the scale of investment required for the buildout of AI and cloud infrastructure . . ." Also on September 25, 2025, at 10:30 AM, Invezz described the "renewed investor scrutiny after a sharp selloff in its shares this week, fueled by concerns that the company's highly touted artificial intelligence partnership with OpenAI may not deliver the expected financial benefits." That same day, StockStory likewise reported that "the company's plan to raise funds through a new bond offering sparked investor caution. While the move was intended to support its expansion in artificial intelligence and data centers, investors were concerned about the potential impact on the company's debt levels."

218. The duration of the bonds—some of which would not mature for forty years, placing prolonged strain on Oracle's credit profile— was of particular concern to the market. For example, on September 25, 2025, at 5:27 PM, MarketWatch published an article on the offering titled "*Why Oracle 'jumbo' AI-fueled bond deal is so unusual; Analysts note that it's unconventional for technology companies to offer bonds that mature in 40 years given how quickly tech can evolve*." In the article, MarketWatch noted certain issues for investors. For example, a senior investment analyst at Gimme Credit was quoted calling into question the maturity dates on some of the bonds in light of the evolving tech landscape in which Oracle operated: '"We've seen

40-year deals, but they're typically with companies with staying power,' such as Coca-Cola Co. . . . Those sort of maturities are 'unusual' with technology, because 'who knows who will be around in 40 years.'"

219. Likewise, a Baird managing director concluded that the bond offering was "'almost insulting,' because 'you can't invest in technology 40 years out."' This same analyst reported that "his clients are worried about a potential debt bubble over the next two years as 'the assumptions on debt are believe-in-the-dream assumptions.'" On September 28, 2025, TD Cowen analysts took note of the duration of the bonds: "$18b was reportedly issued in 7 tranches, with maturities ranging from 5 years to 40 years (one tranche has a 2065 maturity date)." So too did Benzinga on September 24, 2025: "The company offers debt in as many as seven tranches, including a rare 40-year bond."

220. Also on September 24, 2025, at or around 9:01 AM ET, S&P reported its negative outlook for Oracle's credit rating, noting the increasing risks flowing from Oracle's CapEx strategy and outsized reliance on OpenAI for projected revenue. In particular, S&P emphasized that "***Oracle's credit profile will be further strained by accelerating AI infrastructure growth.*** . . . Given its aggressive five-year OCI revenue expansion plan, our base case now calls for capex to reach $38 billion in fiscal 2026." (Emphasis in original). S&P recognized that, "Oracle competes with much larger hyperscalers including Microsoft Inc.'s Azure, Amazon.com Inc.'s AWS, and Alphabet Inc.'s Google Cloud, all of which have greater financial flexibility to outspend Oracle and weather potential downturns." S&P also noted Oracle's reliance on OpenAI's "ability to meet contractual obligations." In sum, S&P noted its "expectation for Oracle's FOCF deficit to widen over the next two to three years as the company ramps up capital spending to meet expected revenue targets. Oracle's AI strategy carries credit risk given this aggressive spending and very high customer

concentration to a startup but OCI's success could improve its overall competitive positioning over the longer term."

221. Oracle's September 24, 2025, announcement regarding the $18 billion bond sale partially revealed to the market the weakness in Oracle's claims about turning its massive and growing CapEx into near-term revenue, and the extent of Oracle's inability to meet its ongoing funding needs. The bond terms also signaled that there was a heightened, previously unknown degree of headwinds and risk in Oracle's ability to translate its ballooning RPO into revenue in the coming years.

222. In response to the above-noted disclosures on the morning of September 24, 2025, the price of Oracle common stock declined $5.37 per share, from a close of $313.83 per share on September 23, 2025, to close at $308.46 per share on September 24, 2025.

223. The next day, on September 25, 2025, further corrective information was revealed to the market. Specifically, prior to market open, multiple media outlets reported that Rothschild had initiated coverage of Oracle at "Sell," setting a ***$175*** price target for Oracle: a 40% cut below its then-current stock price. In this report, Rothschild performed original, Company-specific analysis and issued a clear warning to investors: (1) the market "materially overestimates the value of Oracle's contracted cloud revenues," and (2) Oracle's five-year OCI revenue guidance "worth around . . . $60 billion," was merely a "risky blue-sky scenario that [was] unlikely to materialize." Rather than occupying the role of cloud provider, Rothschild cast Oracle as a "financier," concluding in no uncertain terms that the market was "completely overlook[ing] the risks."

224. In this scathing original analysis and conclusion, analyst Alex Haissl explained that "the value subscribed to [big headline figures in terms of like order wins and . . . revenues] is relatively low."

225. Following this report—and against the backdrop of Oracle requiring more and unusual debt financing—the price of Oracle common stock declined further by $17.13 per share—from a close of $308.46 per share on September 24, 2025, to close at $291.33 per share on September 25, 2025.

226. Numerous industry reports promptly covered the new analysis. For example, on September 25, 2025, Barron's reported on Haissl's sharp critique, noting that, despite Oracle's recent successful round of bond sales, "Oracle doesn't generate the kind of cash flows that bond investors are typically in search of."

227. Likewise, on September 25, 2025, Invezz reported on the "rare sell rating on Oracle" by Rothschild, indicating its role in a growing bearish phenomenon: "concerns are mounting that Oracle's growth narrative may be more fragile than previously thought, particularly given the risks of inflated valuations and the complex nature of its partnership agreements within the AI ecosystem." Additionally, on September 25, 2025, Keybanc analysts remarked on "skepticism that OpenAI will have the ability or willingness to pay for what they have contracted to Oracle and in Oracle's ability to deliver the capacity needed to begin recognizing revenue when the contracts are expected to start."

228. Subsequently, on September 29, 2025, the WSJ reported on the "Debt [] Fueling the Next Wave of the AI Boom," and in so doing, provided a breakdown of Oracle's debt position within its CapEx strategy, without which the Company could not build up the massive data centers it depended on for revenue. The article noted that to fulfill its end of the $300 billion OpenAI contract, Oracle must "spend on that infrastructure before it gets paid in full by OpenAI—which means a lot of borrowing." The article noted that Oracle was "already highly leveraged" with long term debt around $82 billion and a debt-to-equity ratio of approximately 450%.

2. October 13-16, 2025: Defendants Offer Further Words Of Comfort On CNBC And At Oracle AI World

229. Investors' questions and concerns persisted, but were counterbalanced by Defendants' continued representations of strength in response, including on October 13, 2025, when newly established co-CEOs Defendant Magouyrk and Sicilia appeared on a CNBC Exclusive with David Faber. During this interview, they provided assurance to the market that Oracle would realize revenue represented in its enormous and growing RPO number including from its largest customer, OpenAI.

230. Answering Faber's questions regarding the likelihood of OpenAI being able to provide the cash represented in Oracle's $300 billion RPO number associated with the deal, Sicilia stated that he "like[d] their chances," but then suggested such performance was not as critical as the question implied, stating, "we have partnerships with . . . lots of vendors . . . And I think like all their chances, I think they're all doing very well."

231. Defendant Magouyrk further downplayed Oracle's reliance on OpenAI and represented that any downside was mitigated by the volume of demand in the market for what he represented was essentially a fungible service: "I think the market is too big. . . . [t]he reality is, is that AI is applicable to everything. . . . the good thing for us in terms of mitigating any downside is that the infrastructure that these customers needs, while in some ways it's customized, is largely the same. And so really, when you look at the build out that's happening across the industry, it's a bet on the success of AI. Obviously, we have a great relationship with OpenAI, but there are many different customers that are all going to need this type of infrastructure for many, many years to come."

232. The next day, on October 14, 2025, Defendant Ellison took the stage at "Oracle AI World" (a yearly conference formerly called "Oracle Cloud World") to deliver a two-hour keynote

address titled, "Oracle's Vision and Strategy." Ellison acknowledged that the infrastructure needs of the GPT model "require[] enormous amounts of compute" and attempted to reassure customers and investors that Oracle was on-track with its data center build-out, initially stating that Oracle was "in the process of building" the Abilene, Texas, data center, and later stating, "[a]ctually, it's up and running," before later qualifying "[p]art of it is up and running. Eventually, it's going to have a half a million NVIDIA GPUs in it."

233. Ellison then played a video on the construction of the Abilene Stargate data center, with a recorded voice over touting its size and capacity to power AI hardware "[w]hen fully provisioned." The video depicted Sam Altman, OpenAI CEO, and Defendant Magouyrk both in hard hats and construction vests at the data center construction site, seemingly overseeing the infrastructure buildout.

234. The video emphasized the speed at which the site had begun delivering GPUs and capacity: "The project began as empty land in June 2024 and is delivering GPUs in less than one year. The cluster will contain more than 450,000 Nvidia GB200s."

235. The next day, during Magouyrk's keynote address, Vice President of Infrastructure and Industrial Compute at OpenAI, Peter Hoeschele, joined Magouyrk on stage to tout the speed of Oracle's datacenter development, claiming that "Abilene came together in 11 months" while other data centers that he had "worked on . . . at a similar scale, took four years to plan."

236. On October 16, 2025, at the Financial Analyst Day session at Oracle AI World, Magouyrk continued to highlight the rate and controlled costs of datacenter buildout: "***The ramp-up time for [data centers] has cost[s], but it's minimal, and it's something that we're continually optimizing***." Magouyrk stated in prepared remarks that he had "been talking to a lot of different customers and investors and reporters and analysts about . . . how . . . [Oracle] actually go[es] out

and . . . accelerate[s] and scale[s] this build out;" Magouyrk represented that, in this area, "***there is no problem. It's really just an opportunity for us to grow faster, right?***"

237. In prepared remarks later that same day, Defendant Kehring presented an updated financial outlook emphasizing that RPO remained "***the clearest indicator of the revenue that's about to come***" and noting strong "customer demand." Further, Kehring asserted that, following the large Q1 RPO announcement, Oracle had "signed several additional large contracts . . . which put us over the $0.5 trillion mark [for RPO]."

238. Defendant Kehring asserted that Oracle was currently "bringing on capacity faster and faster and with more efficiency . . . . The ramping has already started . . . ."

239. In his prepared remarks, Kehring also stated that Oracle is "working diligently to constantly match our expenses as our revenue ramps in our data centers" which is "critical to be able to deliver profits to our shareholders faster."

240. Kehring concluded by unveiling Oracle's updated financial outlook, featuring a projected ***$225 billion*** in total revenue by FY30. Oracle's outlook for FY26 remained unchanged at $67 billion.

241. Analysts were buoyed by Defendants' assertions. For example, on October 17, 2025, Guggenheim increased its price target for Oracle to $400 and expressed that it was "encouraged . . . about this being a decade stock, driven by the massive opportunity ahead of Oracle that should lead to revenue acceleration over the next few years, led by AI training deals which are comfortably profitable today and are likely to be more so over time."

242. On October 20, 2025, however, UBS noted that, while Oracle had trumpeted its huge guidance raise in coming years, investor questions remained about CapEx and ROI, which Defendants had not squarely addressed, stating: "the real guidance raise was in the FY28-FY30

timeframe (not near-term), [and] Oracle decided not to address its capex and financing needs (perhaps raising concerns about the ROI on its hyper-growth GPU cloud infra business)."

3. December 10 and 11, 2025: In The Next Partial Corrective Disclosures, Oracle Reveals Increased CapEx But Stagnant FY26 Guidance, Negative Q2 FY26 Financial Results, And Billions In Lease Commitments Stretching Over The Next Twenty Years

243. The next partial disclosure came following the close of the market on December 10, 2025, when Oracle announced its Q2 FY26 financial results. Notably, revenue growth was well ***below*** analysts' consensus estimate, while quarterly CapEx was well above analysts' estimates. Oracle also announced a negative FCF of $10 billion.

244. On the accompanying earnings call, also on December 10, 2025, Defendant Kehring disclosed that Oracle now expected to spend an ***additional*** $15 billion on CapEx in FY26—on top of the previously announced $35 billion—bringing the total to a staggering $50 billion. This continued increase in CapEx, however, was not accompanied by any increased FY26 revenue guidance. The Company reiterated its guidance of $67 billion for FY26 and increased its projections for FY27 revenue by only $4 billion.

245. Defendant Magouyrk attempted to reassure investors amidst the negative news. For example, Magouyrk asserted that, only after extensive analysis will Oracle "accept customer contracts, having the confidence we can deliver on schedule with the highest quality." Magouyrk further noted that Oracle had contracted for an additional $68 billion in RPO that quarter, adding that "[t]hese contracts will quickly add revenue and margin to our infrastructure business."

246. When a Deutsche Bank analyst pointedly asked "how much money . . . Oracle need[ed] to raise to fund its AI growth plans ahead," Magouyrk did not provide a specific number. Instead, he responded by emphasizing that Oracle doesn't "***actually incur any expenses for these large data centers until they're actually operational***" and that the figure to "complete these build-

outs" would be ***"less" than $100 billion***.

247. Then, a Jefferies LLC analyst asked, "What would you have to do the converted [sic] data center from one customer or another, such as if one of the larger customers was unable to pay?" In response, Defendant Ellison emphasized how speedy such a process would be, "when you ask the question of, well, how long does it take transfer capacity from one customer to another, ***it's on the order of hours*** . . . ***it is not a laborious process . . . , [i]t is not a unique process***. . . . we're constantly moving customers around and adding aggregate net capacity. So we have the technology. We have a secure base for which to do that, and we also have a customer base of a lot of demand such that whenever we find ourselves with capacity that's not being used, it very quickly gets allocated and provisioned."

248. Analysts reacted negatively. For example, UBS analysts released a report late in the evening on December 10, 2025, in which they lowered their Oracle price target by $55 from $380 to $325 "due to the lighter results and increased uncertainty around the financing outlook," while Barclays also lowered its price target.

249. Following this news, the price of Oracle common stock declined $24.16 per share from a close of $223.01 per share on December 10, 2025, to close at $198.85 per share on December 11, 2025.

250. The truth continued to emerge. Following the market close on December 11, 2025, Oracle filed its Form 10-Q quarterly financial report revealing that it had "$***248 billion of additional lease commitments***, substantially all related to data centers and cloud capacity arrangements, that are generally expected to commence between the third quarter of fiscal 2026 and fiscal 2028 and for ***terms of fifteen to nineteen years*** that were not reflected on our condensed consolidated balance sheets as of November 30, 2025."

251. News outlets reported that Oracle's credit position was strained in part by long term leases, threatening Oracle's ability to deliver on ROI for the market. They also noted Oracle's difficulties in actually delivering data centers on-time to customers. For example, on December 12, 2025, Bloomberg reported that Oracle had "pushed back the completion dates for some of the data centers it's developing for the artificial intelligence model developer OpenAI to 2028 from 2027" due to "labor and material shortages."

252. The market was stunned by these revelations. For example, CreditSights analysts labeled the Company's dramatic increase in lease commitments (in both amount and duration) a "***bombshell disclosure***." Likewise, on December 16, 2025, Bloomberg analysts noted that "Oracle's future lease exposure far exceeds similar commitments by peers" with a "mismatch between the long duration of the property leases and much shorter contracts with key customers such as OpenAI." This disparity was highlighted by the chart below included in Bloomberg's report:




253. Other analysts expressed alarm. For example, on December 12, 2025, a D.A. Davidson analyst stated that "OpenAI is unlikely to deliver on its $300bn commitment," suggesting that Oracle should therefore instead "restructure that contract proactively in order to deploy capital more responsibly instead of pretending it has $523bn of RPO." Likewise, on

December 15, 2025, analysts at J.P. Morgan Research expressed skepticism that Oracle could keep its CapEx below $100 billion, given that its FY26 CapEx "has doubled to $50bn in just two quarters," and warned that "[w]hile we still view common equity issuance as highly unlikely, we expect Oracle will ultimately need to turn to hybrid or preferred issuance to at least partially address investor concerns and keep leverage in check."

254. These developments further revealed and elaborated to the market what had been evidenced on December 10—that Oracle could not provide a return on CapEx "right away," but rather needed to invest even more in its infrastructure build-out in the hope of potential revenue in the future, including through extensive, long term lease commitments. Oracle was not simply building data centers and computing power to meet present demand, but was locked into hundreds of billions of dollars of long-term commitments regardless of whether the AI-infrastructure business panned out.

255. Following this news, the price of Oracle common stock declined $8.88 per share, or approximately $4.5%, from a close of $198.85 per share on December 11, 2025, to close at $189.97 per share on December 12, 2025. The decline over the two-day window of December 11 and 12 was more than $32 per share.

4. December 17, 2025: In The Final Corrective Disclosure, Blue Owl Capital Backs Out Of $10 Billion Dollar Funding Of Data Center, Citing Concerns For Oracle's Spending Commitments And Mounting Debt

256. Finally, on December 17, 2025, before market open, the *Financial Times* reported that Blue Owl Capital—"the primary backer for Oracle's largest data centre projects in the US," having invested "its own money and rais[ed] billions more in debt to build the facilities"—had ***backed out*** of funding a $10 billion Oracle data center intended to serve OpenAI. According to the *Financial Times*, Blue Owl Capital pulled out of the deal as a result of concerns about Oracle's spending commitments and rising debt levels.

257. On this news that an asset management company with access to extensive diligence and understanding of Oracle's operational and debt landscape was walking away from Oracle, the price of Oracle common stock declined $10.19 per share, from a close of $188.65 per share on December 16, 2025, to close at $178.46 per share on December 17, 2025.

258. On December 17, 2025, financial news analyst Proactive reported that Oracle common stock fell 6% following the *Financial Times* revelation, noting that the relevant data center was intended to serve OpenAI, and that the withdrawal created a funding gap that placed the entire build out in question. Moreover, Proactive noted that lenders were becoming increasingly cautious about Oracle's rising debt levels and heavy CapEx.

259. Baptista Research published a report on December 19, 2025, in which analysts posited that Oracle's AI ambitions may have been "too big, too fast," and that the "high-profile blow" Oracle took with the withdrawal of Blue Owl was immediately reflected in the market's response, with the event potentially being "a canary in the coal mine for investors questioning the long-term sustainability of [Oracle's data center funding] as financial conditions tighten." Per Baptista, Oracle's financial leverage was one of Oracle's "biggest red flags," given the new debt the Company sold pushing total debt to $111 billion and Oracle's lease obligations soaring by $152 billion in just three months. "If Oracle can't keep up with the pace of monetization, it risks becoming a cautionary tale of how chasing AI hype too aggressively can backfire on a balance sheet."

## VI. POST-CLASS PERIOD EVENTS

260. Following the conclusion of the Class Period, further evidence emerged demonstrating Oracle's deeply flawed capacity to timely deliver on AI-infrastructure service contracts and strained financial position.

261. On its March 10, 2026, Q3 FY26 earnings call, Oracle announced a "Bring-Your-

Own-Hardware" (BYOH) initiative whereby customers would be responsible for purchasing their own equipment, shifting the investment off Oracle's balance sheet. In tandem, Oracle also announced its purported success with upfront customer prepayments. Defendant Magouyrk stated that these changes would allow Oracle "to continue expanding without any negative cash flow from Oracle."

262. On April 23, 2026, Morgan Stanley noted that, under the BYOH arrangements, "Oracle's value proposition" "is limited" and that it did "not expect this dynamic to yield near term benefit[.]" During the same earnings announcement, Oracle again reiterated previous revenue guidance for FY26. Notably, Defendants declined to provide any guidance for the Company's 2027 CapEx. Indeed, when an analyst specifically asked for "visibility into CapEx for fiscal 2027," Defendant Kehring stated that Oracle would discuss next year's CapEx at the end of fiscal year 2026.

263. On March 31, 2026, Oracle executed the largest workforce reduction in its history, laying off approximately 15% of its global workforce. In a June 10, 2026 analyst report, CFRA called the spring layoffs a "necessary but concerning move that underscores the mounting financial pressures ORCL faces as it pursues its massive AI data center buildout. . . [T]his development reinforces the concerns about ORCL's deteriorating cash position and heavy reliance on cost cuts."

264. Despite its attempts to stabilize FCF, on June 12, 2026, Oracle reported substantial negative FCF of -$24 billion, as well as declining gross margins, to come in FY27. The Company also announced that CapEx for FY26 reached $55.7 billion. In a move that Vital Knowledge analysts Adam Crisafulli called "a disappointment," Oracle reiterated its FY27 guidance of $90 billion, while at the same time announcing massively increased CapEx spending.

265. Specifically, Oracle forecasted CapEx of $95 billion in FY27. Further, it announced

that, in fiscal year 2027, Oracle anticipated needing to raise even more debt to fund its data center work—approximately $40 billion.

## VII. DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

### A. June 11, 2025 – 4Q 2025 And FY 2025 Earnings Release And Earnings Call

266. At 4:05 PM ET on June 11, 2025, Oracle issued a press release announcing 4Q FY25 and FY25 financial results. On the same day, at 5:00 PM ET, Oracle held an earnings call to discuss the Company's Q4 and year-end FY25 financial results. Defendants Catz and Ellison participated in the call.

267. In the press release, Defendant Catz stated:

> FY25 was a very good year—but we believe FY26 will be even better as ***our revenue growth rates will be dramatically higher***. . . . We expect our total cloud growth rate—applications plus infrastructure—will increase from 24% in FY25 to over 40% in FY26. Cloud Infrastructure growth rate is expected to increase from 50% in FY25 to over 70% in FY26. And RPO is likely to grow more than 100% in FY26. Oracle is well on its way to being not only the world's largest cloud application company—but also one of the world's largest cloud infrastructure companies.

268. Similarly, Defendant Ellison stated:

> Overall Oracle Cloud Infrastructure consumption revenue grew 62% in Q4. ***We expect OCI consumption revenue to grow even faster in FY26. OCI revenue growth rates are skyrocketing—so is demand***.

269. Defendant Catz also asserted:

> ***The vast majority of our CapEx investments are for revenue-generating equipment that is going into data centers*** and not for land or buildings. I expect that ***FY26 CapEx will be higher at over $25 billion as we work to meet demand from our backlog***. ***As we bring more capacity online, our revenue and profit growth will further accelerate.***

270. Likewise, during the earnings call, Defendant Ellison asserted that "Oracle will be the number one builder and operator of cloud infrastructure data centers." Ellison added that

"***Oracle is already prospering in this new era of cloud computing and AI, and it's just the beginning***."

271. After a Melius Research analyst asked for "more color" on what Oracle's CapEx was spent on (noting it was "much higher than expected . . . $5 billion more than we expected to get to the $21 billion") and for an explanation of how it would "help[] [Oracle] yield more revenue," Defendant Catz responded by emphasizing Oracle's purported focus on building to meet current demand:

> The reality is that, as I mentioned on the call, our CapEx is usually about equipment. We're not -- we have building partners who charge us rent once they finish constructing things. And ***when we all of a sudden have higher CapEx, it means we are filling out data centers and we are buying components to build our computers***, ***which are different than other people, and we are putting them on the floor***.
>
> We had an opportunity to buy up and for deployment, and so we did, and we are putting out as much capacity as we possibly can as quickly as we can. I do believe that the $25 billion next year may turn out to be understated. So it is all to meet demand. We don't order, ***we don't build unless we've got orders for our capacity to be built out***. And we have so much in orders right now that I actually expect -- I believe I said on the call, over $25 billion this next quarter. And that is, again, to match demand.

272. Defendant Catz likewise responded to a Guggenheim analyst asking for "color beyond Stargate to help [investors] get [their] heads around those massive growth numbers . . ." Catz responded that Oracle had "so much in pipeline right now . . . ***and of course, we have so much in RPO, meaning those are noncancelable contracts***, and we see the demand I am still in a position where our supply is not meeting our demand." Catz had made a similar point in her prepared remarks, stating "OCI has seen exceptional demand for infrastructure services and ***those contracted noncancelable bookings in RPO***" gave Oracle "***confidence that OCI revenue will grow over 70% this current year***."

273. Defendants' statements set forth in the italicized and bolded language in ¶¶267-72, were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In fact, Defendants were aware (or recklessly disregarded) that CapEx investments for "revenue-generating equipment" like microchips and data center infrastructure would not lead to accelerated near-term revenue growth due to substantial failures and headwinds impeding Oracle's ability to timely execute on its contractual obligations and obtain revenues. As described by numerous Fes (as set forth in Section V.B., *supra*), during the Class Period: (i) Oracle regularly promised delivery dates that were unrealistic and even ridiculous, and as a result, regularly failed to timely deliver adequately functional data centers to customers, thus requiring additional work and further delays before Oracle satisfied its contractual obligations; (ii) contrary to established industry practices, Oracle performed migrations in AI data centers actively under construction, which introduced dust and dirt into the data centers' fiber optic network cables making the data center non-functional and requiring remediation, which caused further delays; (iii) due in large part to Oracle's inexperience, haste, and lack of adequate manpower to build and equip data centers of the scale required by contractual obligations, issues with construction, power, and cooling repeatedly caused delays and most of Oracle's AI data center projects—indeed, as described by multiple former employees, the build-out of data centers was not the quick and simple task described by Defendants but an onerous one in which Oracle had little experience or competence; (iv) Oracle had a practice of ordering incorrect, outdated, and/or superfluous equipment and renting and/or building not only the space it currently needed but space it desired for potential future projects. As described by former employees, Oracle internally espoused a build-it-and-they-will-come approach, and incurred expenses without a corresponding concrete revenue stream. This not only ensured that substantial

expenses would not lead to near-term revenue but also led to waste and expenditures that would never translate into revenue as data centers were shuttered or left empty; (v) Oracle lacked the cash to fund the build-out necessary to satisfy its contractual obligations; (vi) Oracle faced equipment sourcing issues caused by chips becoming obsolete because Oracle's delayed build-outs took too long to complete; and (vii) Oracle engaged in significant layoffs in an attempt to generate additional cashflow to meet expenditures, which only further strained its manpower needs.

274. Defendants' statement that "we have so much in RPO, meaning those are noncancelable contracts" was materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, for the same reasons as described in ¶273, including regarding Oracle's present failures and headwinds, and also because it failed to disclose the significant risk that the Company would be unable to perform consistent with the contracts underlying the RPO numbers. As explained by former employees, Oracle did not have the ability to deliver the products and services contracted due to the scope of the projects and Oracle's own inexperience and inability, and as set forth in Section V.B, *supra*.

**B. June 18, 2025 – FY 2025 Form 10-K**

275. On June 18, 2025, Oracle filed its FY25 Annual Report on Form 10-K, signed by Defendants Catz, Ellison, and Smith. The Form 10-K stated the following: "We believe that ***our current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our working capital, capital expenditures and contractual obligations requirements***." Additionally, it stated that Oracle had "$43.4 billion of additional lease commitments, primarily for data centers, that are generally expected to commence between fiscal 2026 and fiscal 2028 and for terms of ten to sixteen

years that were not reflected on our consolidated balance sheet as of May 31, 2025 or in the maturities table above."

276. Further in its "Business and Operational Risks," Oracle provided purported disclosures of risk:

> ***If we do not successfully execute our Oracle Cloud strategy, including our offerings of Oracle Cloud Services, our revenues and profitability may decline.*** We provide our cloud and other offerings to customers worldwide via a variety of deployment models, including via our cloud-based OCA and OCI offerings. As these business models continue to evolve, we may not be able to compete effectively, generate significant revenues or maintain the profitability of our cloud offerings. Additionally, the increasing prevalence of various cloud offering models by us and our competitors may unfavorably impact the pricing of our cloud and license offerings. ***If we do not successfully execute our cloud computing strategy or anticipate the cloud computing needs of our customers, our reputation as a cloud services provider could be harmed and our revenues and profitability could decline.***

(First emphasis in original).

277. Additionally, the "Business and Operational Risks" noted that:

> ***If we are unable to secure data center capacity at affordable rates or do not accurately plan for and manage our infrastructure capacity requirements, our profitability may decline.*** As a part of our Oracle Cloud strategy, we plan our investment levels based on estimates of future revenues and customer demand and future anticipated rates of growth. In recent periods, our cloud services and license support expenses have grown to meet current and expected demand for our cloud offerings, including investments to increase our existing data center capacity and to establish data centers in new geographic locations. In connection with these investments, we entered, and expect to continue to enter, into long-term lease commitments with third-party data center providers and other significant commitments with suppliers of chips and other data center infrastructure. If we underestimate customer demand or our data center capacity needs, we may face shortages of available infrastructure, limiting our ability to support customer growth and potentially causing us to lose business to competitors. Conversely, ***if we overestimate customer demand or our data center capacity needs, we could be locked into multi-year commitments for excess data center space, resulting in lower profitability and cash flows*** because our third-party data center vendors generally require us to pay significant contract termination fees to early exit such obligations. Data centers in geographies that we rely on may also be unavailable on commercially reasonable terms or at all. Moreover, we do not control the operation of these third-party data centers, and they may suffer interruptions in service from

> events beyond our control, including from acts of government, natural events, power loss, break-ins or misconduct by those third parties. We have faced, and may continue to face, rising costs for data center energy demands. In addition, we rely on third-party suppliers to provide equipment and components required to outfit these data centers on a timely basis. ***Ongoing or future delays or the inability to meet customer demand could cause the loss of additional sales, delay our revenue recognition or increase our costs, all of which could adversely affect the margins of our business***. We typically depreciate these assets over their estimated useful lives, which could be shortened should our cloud strategies change, which could adversely affect our profitability.

(First emphasis in original).

278. Defendants' statements set forth in the italicized and bolded language in ¶275, including those concerning Defendants' representations that "***[w]e believe that our current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our . . . capital expenditures . . . requirements,***" were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact. In truth, Defendants knew, or were reckless in not knowing, that they could not afford necessary CapEx without making substantial additional debt or equity offerings. Indeed, within less than three months, Defendants made an $18 billion debt offering on September 24, 2025. Additionally, as noted by multiple FEs and described in ¶273 Defendants knew Oracle was not capable of timely delivering data centers, and was in fact regularly not timely delivering on such obligations, which was a prerequisite to Oracle's receipt of revenues, due to numerous core failures.

279. In addition, Defendants' purported risk disclosures set forth in the italicized and bolded language in ¶¶276-77 were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact same reasons as described in ¶273 It was not a hypothetical possibility that Oracle may "not successfully execute [its] Oracle Cloud strategy" or "accurately plan for and manage our

infrastructure capacity requirements" or that "[Oracle] could be locked into multi-year commitments for excess data center space" or "[o]ngoing or future delays or the inability to meet customer demand could cause the loss." These very risks had come to pass and/or were doing so within the organization at the time these statements were made.

### C. September 9, 2025 – 1Q 2026 Earnings Release And Earnings Call

280. On September 9, 2025, at 4:05 PM ET, Oracle issued a press release announcing the Company's financial results for Q1 2026, ending August 31, 2025.

281. While addressing Oracle's CapEx and cash flow, Defendant Catz stated: "We signed four multi-billion-dollar contracts with three different customers in Q1. . . . ***This resulted in RPO contract backlog increasing 359% to $455 billion. It was an astonishing quarter—and demand for Oracle Cloud Infrastructure continues to build.***"

282. Defendant Ellison represented that: "***We expect MultiCloud revenue to grow substantially every quarter for several years as we deliver another 37 datacenters to our three Hyperscaler partners, for a total of 71***."

283. That same day, during the accompanying earnings call at 5 PM ET, Defendant Catz stated: "***[F]iscal year '26 Capex will be around $35 billion***," but "***the vast majority of our CapEx investments are for revenue-generating equipment that is going into the data centers and not for land or buildings***." Catz further asserted that, "***[a]s we bring more capacity online, we will convert the large RPO backlog into accelerating revenue and profit growth***" and that "***[b]eyond fiscal year [']26, I'm even more confident in our ability to further accelerate our top- and bottom-line growth rate***."

284. Defendant Catz further stated in her prepared remarks: "We now expect Oracle Cloud Infrastructure will grow 77% to $18 billion this fiscal year and then increase to $32 billion and $73 billion dollars, $114 billion, and $144 billion over the following four years. Much of this

revenue is already booked in our $455 billion [R]PO number. We are off to a fantastic start this year."

285. During this call, a Cowen and Company LLC analyst asked Defendant Catz if she could "provide a bit more context on how much CapEx and operational cost structure will be needed to fully service these contracts" and "generally, how investors should be thinking about the ROI on the spend?" In response, Defendant Catz asserted:

> First of all, as I mentioned in the prepared remarks and as I've said very clearly beforehand, ***we do not own the property. We do not own the buildings. What we do own and what we engineer is the equipment***. That's equipment that is optimized for the Oracle Cloud.
>
> It has extremely special networking capabilities. It has technical capabilities from Larry and his team that allows us to run these workloads much, much faster. And as a result, it's much cheaper than our competitors, depending on the workload.
>
> ***Now, because of that, what we do is we put in that equipment only when it's time and usually very quickly. Assuming that our customer accept[s] it, we're already generating revenue right away***. The faster they accept the system and that it meets their needs, the faster they start using it, the sooner we have revenue.
>
> This is, in some ways, I don't want to call it asset light from the finance world, but it's asset pretty light. And that is really an advantage for us. I know some of our competitors, they like to own buildings. That's not really our specialty. Our specialty is the unique technology, the unique networking, the storage, just the whole way we put these systems together.
>
> By the way, they are identical and very simplified; and again, making it possible for us to be very profitable while still being able to offer our customers an incredibly compelling price.
>
> What I have indicated is that CapEx looks like ***it's going to be about $35 billion for this fiscal year. But because we're monitoring this, we're literally putting it in right when we take possession and then, handing it over to generate revenue right away***.
>
> So ***we have a very good line of sight for our capabilities to put this out and basically to just spend on that CapEx right before it starts generating revenue***. But at this point, ***I'm looking at $35 billion for the year.*** And I think -- it could be a little higher but I think -- and ***if it is higher, it's good news because it means more capacity has been handed over to me in terms of floor space***.

> As you also know, we are embedded in our competitors' cloud. Again, ***all we are responsible for to pay for is, in fact, our equipment, and that goes right away***. There, we're moving ultimately to 71 data centers embedded in our competitors/partners.

286. On this call, Defendant Ellison stated that "demand is going to be insatiable" for Oracle's AI cloud offerings and that "***we can deliver a lot of databases and a lot of AI across our cloud over the next several years***." Ellison also stated: "[We] just turned over a giant data hall to one of our customers. The acceptance time could have been as long as a couple of months. It was one week. It was one week from the time we officially owned the equipment and they were testing it to the time they started paying for it. One week***. So we have an extraordinary team that's doing an extraordinary job of making sure that we get the equipment working very quickly. And our customers can accept it, they want to accept it as fast as possible because they want to do the work, they want to train their models. And this one took a huge hall, took one week for acceptance***."

287. Defendants' statements set forth in the italicized and bolded language in ¶¶281-83, 285-86, including those concerning the rate at which Oracle could transform expenditures into the infrastructure necessary to generate promised near-term revenue, were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact for the reasons described in ¶273.

**D. September 10, 2025: Form 10-Q**

288. On September 10, 2025, Oracle filed its quarterly report on Form 10-Q for Q1 FY26, signed by Defendants Catz and Smith. That report stated in relevant part, "[w]e believe that ***our current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our working capital, capital expenditures and contractual obligations requirements***." This report further stated that

"$99.8 billion of additional lease commitments, substantially all for data centers, that are generally expected to commence between the second quarter of fiscal 2026 and fiscal 2028 and for terms of ten to sixteen years that were not reflected on our condensed consolidated balance sheets as of August 31, 2025."

289. Under the sub-heading "**Item 1A. Risk Factors**," in the Form 10-Q, Oracle directed investors to its June 18, 2025 Fiscal Year 2025 Form 10-K, stating, "***[i]n addition to the other information set forth in this Quarterly Report, you should carefully consider the factors discussed in Part I, Item 1A Risk Factors in our Annual Report on Form 10-K for the fiscal year ended May 31, 2025. The risks discussed in our Annual Report on Form 10-K could materially affect our business, financial condition and future results***." (First emphasis in original).

290. Defendants' statements set forth in the italicized and bolded language in ¶288 concerning Oracle's present ability to fund CapEx were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact for the reasons described in ¶¶273and 278.

291. Finally, Defendants' statements set forth in the italicized and bolded language in ¶289 concerning potential risk factors, which incorporated the risk factors as set forth in Oracle's June 18, 2025 FY25 Form 10-K, were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact for the reasons set forth in ¶273.

**E. October 16, 2025 - Oracle AI World: Financial Analyst Day Session**

292. On October 16, 2025, at the Financial Analyst Day session during Oracle AI World, in prepared remarks, Defendant Magouyrk stated:

> We spend a lot of our energy aligning our revenue and our expenses. ***The ramp-up***

> ***time for this stuff has cost, but it's minimal, and it's something that we're continually optimizing.*** And the expense of that ramp-up is included in the gross margin. So when I talk about, 'Hey, here's the gross margin range of one of these customers," we don't go in and assume, right, that, I don't know, some – you're not accounting for these ramp-up expenses, the gross margin includes the assumptions around those ramp-up expenses. Okay. Next. ***I've been talking to a lot of different customers and investors and reporters and analysts about, okay, how do we actually go out and we accelerate and scale this build out? Fundamentally, there is no problem. It's really just an opportunity for us to grow faster, right?***

293. During the same Financial Analyst Day, Defendant Kehring presented an updated financial outlook in highlighting RPO numbers stated that RPO remained "***the clearest indicator of the revenue that's about to come***."

294. Defendants' statements set forth in the italicized and bolded language in ¶¶292-93 regarding the minimal data center ramp up were materially false or misleading when made, omitted material facts necessary to render such statements not misleading, and lacked a reasonable basis in fact, for the reasons set forth in ¶273.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

295. Numerous facts including those detailed above, considered collectively, demonstrate that Defendants knew or recklessly disregarded that their statements (*see* Section VII) were materially false and misleading. In addition to the facts alleged in Sections V and VII, the Individual Defendants' scienter is evidenced by the specific facts discussed below.

296. ***First***, the Individual Defendants received personally or had access to data and information related to CapEx planning and investments in relation to Oracle's OCI cloud offerings and massive AI-related build-out efforts. *See* ¶¶106, 113-28, 142, 149-58, *supra*. For example, Oracle maintained a dashboard where it tracked spending on hardware and infrastructure required to power data centers at a granular level including, *inter alia*, equipment costs for AI data center hardware, such as server racks and data equipment. The dashboard gave senior management in Oracle's finance division insight into anticipated costs.

297. The Individual Defendants also had access to all Oracle finance, sales, marketing, and HR data through a centralized data platform (GBA) maintained by the Global Business Finance Group, and personally received weekly black book reports that used Oracle's sales pipeline and historical conversion rates to predict quarterly bookings. The information provided to Defendants Ellison and Catz in their preferred, customized spreadsheet format, contained calculations that would include both the amount to be booked in particular quarters and the amount of revenue to follow.

298. The Individual Defendants additionally had access to tracking of P&L budgets, revenue forecasts, and quarterly tracking analytics which included win-loss analyses assessing the success rates of corporate sales and revenue strategies. Oracle also prepared financial models to project out the Company's revenue per region, providing insight for the Individual Defendants as to progress on promised revenue metrics. Thus, Oracle executives received on a weekly basis a report of booked contracts, and how that number stacked up to what Oracle could recognize as revenue for the quarter—the ROI for investors from the CapEx spending. As such, the Individual Defendants had visibility into work that was stuck in backlog, and what bookings were paying off in near-term revenue.

299. The Individual Defendants also had visibility into spending for the data center buildouts. Specifically, as recounted by FE-13, Oracle's Fusion was accessible by senior management up to and including Defendant Ellison. In fact, the system required that orders of hardware exceeding certain amounts be approved by a director, senior director, VP, SVP, or even, for orders over $100,000, Defendant Ellison. As such, the Individual Defendants had knowledge throughout the Class Period of ongoing problems with equipment, hardware, and lagging near-term revenue.

300. ***Second***, the Individual Defendants repeatedly addressed CapEx's relation to near-term revenue projections and RPO in response to analyst and investor questions, as well as in their prepared remarks professing to have highly specific knowledge and insight into Oracle's activities, metrics and operations in connection with these topics.

301. For example, at the FY25 earnings call on June 11, 2025, Defendant Catz stated in her prepared remarks that "OCI has seen exceptional demand for infrastructure services, and those contracted non-cancelable bookings in RPO"—including the "Oracle Autonomous Database and the AI data platform"—gave Defendants "confidence that OCI revenue will grow over 70% this current year."

302. During the same FY2025 earnings call on June 11, 2025, in response to a Melius Research analyst's multi-part question asking for "more color" on Oracle's CapEx spend, Defendant Catz professed her detailed insight into how Oracle's CapEx was being deployed, stating that:

> ***[W]hen we all of a sudden have higher CapEx, it means we are filling out data centers and we are buying components to build our computers, which are different than other people, and we are putting them on the floor. We had an opportunity to buy up and for deployment, and so we did, and we are putting out as much capacity as we possibly can as quickly as we can.***

303. On this same call, Catz answered a question from a Guggenheim analyst on Oracle's FY26 growth representations, stating that Oracle had "***so much in pipeline right now . . . and of course, we have so much in RPO, meaning those are noncancelable contracts, and we see the demand I am still in a position where our supply is not meeting our demand***." Defendant Ellison expressed his own, granular knowledge of Oracle's business activities in this regard:

> ***[W]e recently got an order that said we'll take all the capacity you have wherever it is. It could be in Europe, it could be [in] Asia, we'll just take everything. I mean we [never got an] order like that before. . . . The demand is astronomical. We have to—but we have to do this methodically. The reason demand continues to outstrip supply is, we can only build these data centers, build these computers so***

***fast.***

304. On September 9, 2025, during the Q1 FY26 Earnings Release Call, Catz responded to a question from a Cowen and Company LLC analyst regarding the connection between Oracle's RPO metric and spending necessary to build out data centers, and "generally, how investors should be thinking about the ROI on the spend?" In response, Catz held herself out to investors as specifically knowledgeable on all aspects of this subject, noting that CapEx would lead to increases in revenue ***"right away"*** and asserting that

> ***[W]e do not own the property. We do not own the buildings. What we do own and what we engineer is the equipment. That's equipment that is optimized for the Oracle Cloud. . . . Now, because of that, what we do is we put in that equipment only when it's time and usually very quickly. Assuming that our customer accept[s] it, we're already generating revenue right away . . . What I have indicated is that CapEx looks like it's going to be about $35 billion for this fiscal year. But because we're monitoring this, we're literally putting it in right when we take possession and then, handing it over to generate revenue right away. So we have a very good line of sight for our capabilities to put this out and basically to just spend on that CapEx right before it starts generating revenue."***

305. ***Third***, the Individual Defendants repeatedly addressed Oracle's ability to fund operations and CapEx with existing cash in SEC filings, professing to have knowledge and certifying the accuracy of the statements. For example, regarding Oracle's FCF and ability to meet capital expenditure requirements, Oracle stated in both its FY25 10-K and FY26 Q1 10-Q, which were both signed by Defendants Catz and Smith with the former additionally signed by Defendant Ellison, that: "***We believe that our current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our working capital, capital expenditures and contractual obligations requirements***." Individual Defendants controlled the contents of these SEC filings and had the ability and opportunity to prevent their issuance or correct the misstatements.

306. ***Fourth***, the Individual Defendants publicly and affirmatively claimed to have knowledge of the speed at which Oracle could turn CapEx expenditures into revenue and the certainty of RPO leading to revenue. For example, on October 16, 2025, at the Financial Analyst Day session during Oracle AI World, Defendant Magouyrk highlighted the rate and costs of datacenter buildout: "***The ramp-up time for [data centers] has cost[s], but it's minimal, and it's something that we're continually optimizing***." Magouyrk stated in prepared remarks that he had "been talking to a lot of different customers and investors and reporters and analysts about . . . how . . . [Oracle] actually go[es] out and . . . accelerate[s] and scale[s] this build out"; Magouyrk represented that, in this area, "***there is no problem.***" And in prepared remarks later that same day, Defendant Kehring presented an updated financial outlook emphasizing that RPO remained "***the clearest indicator of the revenue that's about to come***" and noting strong "customer demand."

307. The Individual Defendants' public statements strongly and plausibly suggest that each had detailed knowledge of, or access to, the material facts and information misrepresented or concealed, or were deliberately reckless in failing to investigate the issues on which they spoke about publicly.

308. ***Fifth,*** Oracle's strategy to dramatically increase CapEx spending on data center infrastructure while simultaneously promising increased near-term revenue was a focus at the highest levels of Oracle during the Class Period, with Defendants receiving extensive reporting and data on it and Defendant Ellison directly approving any hardware purchases of over $100,000 giving him direct knowledge of significant expenditures.

309. ***Sixth***, the alleged false and misleading misstatements and omissions concern Oracle's core operation that drove the Company's overall financial performance and outlook—OCI, closely tied to its AI infrastructure buildout. The Individual Defendants publicly addressed

this core operation repeatedly, including as the centerpiece of Oracle's flagship Oracle AI World investor event in October 2025.

310. CapEx related to OCI was a maximally important business activity for Oracle during the Class Period, as reflected in Defendants' repeated public statements, and consistent attention and reporting on the topic by investment analysts and national media covering Oracle throughout this period.

311. Further, OCI made up a significant portion of Oracle's overall revenue. For example, in Q4 FY25, OCI made up 18.8% of Oracle's overall quarterly revenue, while in Q1 FY26, made up 22% of the Company's total quarterly revenue, representing tens of billions of dollars.

312. ***Seventh***, the fact that the Individual Defendants made false and misleading statements just weeks before the truth began to be revealed to the market is indicative of scienter. For example, on September 10, 2025, in its Form 10-Q for Q1 of FY26, signed by Defendants Catz and Smith, Oracle represented that it had enough cash on hand to meet its CapEx needs, stating in relevant part, "We believe that ***our current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our working capital, capital expenditures and contractual obligations requirements***." Just two weeks later, Oracle announced the issuance of $18 billion of debt. This close proximity supports an inference that the Individual Defendants knew or were reckless in not knowing that their statements were materially false or misleading.

313. ***Eighth***, the Individual Defendants occupied high-level executive positions throughout the Class Period. As the Executive Chairman, CEO, CFO, and CAO of Oracle, Defendants Ellison, Catz, Magouyrk, Kehring, and Smith, respectively, controlled the Company's

daily operations, directly participated in the Company's management, and received material nonpublic information and updates about Oracle's core operations, including the demand for its OCI offerings, its CapEx strategy to swiftly build out data center infrastructure, and its tracking of RPO as indicative of the timing of revenue.

314. Because of their positions as the Company's senior-most officers, the Individual Defendants also controlled the contents of, drafted, reviewed, and/or disseminated the material misstatements and omissions alleged in Section VII; were provided with, or had access to, the material misstatements and omissions prior to, or shortly after, their issuance, and had the power and authority to prevent their issuance or cause them to be corrected; and knew, or were deliberately reckless in not knowing, that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations made to investors were materially false, misleading and incomplete.

315. ***In addition***, Defendants Catz, Magouyrk, and Smith engaged in large stock sales during the Class Period that were unusual and suspicious in time and amount, and also dramatically out of line with their prior trading practices.

316. These Oracle stock sales during the Class Period were extremely large, in terms of both amount and percentages of holdings sold.

317. Defendant Catz sold 8,694,918 shares of Oracle stock between June 20 and 27, 2025, reaping approximately ***$1.82 billion***. Through these transactions, Defendant Catz disposed of ***50%*** of her holdings.

318. Defendant Magouyrk sold 175,505 shares of Oracle stock in several sales between June 17 and October 21, 2025, reaping approximately ***$49 million***. Through these transactions, Magouyrk disposed of ***53%*** of his Oracle holdings.

319. Defendant Smith sold 43,448 shares of Oracle stock between July 3 and December 5, 2025, for proceeds of approximately $11.5 million. She sold ***45%*** of her holdings.

320. The Defendants' trading activity during the Class Period was markedly disproportionate to their prior trading activity. During the six-month period immediately preceding the six-month Class Period, December 11, 2024 to June 11, 2025 (the "Control Period"), Defendant Catz disposed of only 27.9% of her holdings (compared to 50% during the Class Period). Similarly, Catz sold 3,805,082 shares during the Control Period, less than half of the number she unloaded during the Class Period. And she received proceeds of $705,455,414 on these sales—again, less than half of her proceeds on Class Period sales.

321. Likewise, Defendant Smith's Class Period trading activity far exceeded her Control Period trading. During the Control Period, Smith sold 10% of her holdings (compared to the 45% she sold in the Class Period), and received just over $1 million in proceeds—ten times less than what she reaped on her Class Period trades. During the Control Period, Defendant Magouyrk did not sell any Oracle stock at all.

322. Substantial amounts of Defendants Smith's and Magouyrk's Class Period trades were made on the open market (20,000 shares for Smith and 76,241 shares for Magouyrk), and none were made pursuant to a trading plan under SEC Rule 10b5-1. Although some or all of Defendant Catz's stock sales were made pursuant to a 10b5-1 plan, the circumstances of her sales are sufficiently suspicious to overwhelm any exculpatory inference that might be drawn based on such a plan.

323. Indeed, even if Defendant Catz entered into a 10b5-1 plan prior to the Class Period and traded within that same plan during the Class Period, such plans are under heavy SEC scrutiny in light of a June 22, 2022 WSJ article titled "CEO Stock Sales Raise Questions About

Insider Trading," which reports analysis that found that insiders trading pursuant to 10b5-1 plans were still trading at opportune times and reaping better-than-expected results.

324. Accordingly, the trading behavior of Defendants Catz, Magouyrk, and Smith during the Class Period further supports a strong inference of scienter.

## IX. LOSS CAUSATION

325. The fraud alleged herein was the direct and proximate cause of the economic losses suffered by Plaintiff and the Class. There was a causal connection between the alleged fraud and the loss (i.e., securities price declines) alleged herein.

326. During the Class Period, Plaintiff and the Class purchased or otherwise acquired Oracle securities, including common stock and call options at artificially inflated prices, or sold put options at artificially deflated prices, and were damaged thereby when the price of Oracle common stock declined in response to the disclosures alleged in this section and above in Section V.D ¶¶213-59, *supra*, and/or or when the risks previously concealed by Defendants' material misrepresentations and omissions materialized. The prices of Oracle call and put options rose and fell in correspondence with the movements of the Company's common stock price and for the same reasons.

327. Throughout the Class Period, Defendants' materially false or misleading statements and omissions artificially inflated the prices of Oracle common stock and call options and/or maintained the prices of these Oracle securities at artificially inflated levels, or artificially deflated or maintained the artificial deflation in the price of Oracle put options. As alleged in the remainder of this Section, the price of Oracle common stock significantly declined, causing corresponding changes in the prices of Oracle options, and causing investors to suffer losses, in response to a series of partial disclosures concerning the revelation of facts that Defendants misrepresented and concealed, and/or as the foreseeable risks concealed or obscured by Defendants'

misrepresentations and omissions were revealed and/or materialized through the disclosure of new information. Those disclosures are alleged in detail above in Section V.D ¶¶213-59, *supra*, and summarized again in this section.

**A. First Partial Disclosures: September 24 And 25, 2025**

328. On September 24, 2025, before the market open, Bloomberg reported that Oracle was issuing approximately $15 billion in corporate debt; within hours, reports noted that the full amount of the offering was $18 billion. Market observers immediately linked this bond offering to the Company's aggressive AI infrastructure build-out, noting that Oracle had spent years trailing the top cloud infrastructure vendors, and was now on the hook for significant up-front costs in order to try to meet its commitments to customers. The revelation of how much long-term debt Oracle was required to take on to cover its negative cash flow and fund its endeavors sparked investor concern and scrutiny regarding the reliability of the revenue Defendants had represented would follow directly from Oracle's ever-increasing CapEx and Oracle's credit risk profile, given the size of the offering and the fact that it would not fully mature for 40 years.

329. Furthermore, on September 24, 2025, at or around 9:01 AM ET, S&P reiterated a negative outlook for Oracle's credit rating, reporting growing risks surrounding Oracle's CapEx strategy.

330. In response to these developments, the price of Oracle common stock declined $5.37 per share, from a close of $313.83 per share on September 23, 2025, to close at $308.46 per share on September 24, 2025. *See* ¶¶ 216-22, *supra*.

331. Continuing from there, on September 25, 2025, at or around 9:10 AM, Rothschild published a report containing original analysis and conclusions that stated, among other things, (a) the market "materially overestimates the value of Oracle's contracted cloud revenues," and (b) Oracle's rosy projections of substantial revenue growth were merely "risky blue-sky scenario[s]

that [were] unlikely to materialize." Accordingly, Rothschild was initiating coverage of Oracle at "Sell," setting a $175 price target for Oracle—40% below Oracle's then-current stock price. Multiple market analyst and press reports noted Rothschild's analysis and conclusions.

332. On these developments, the price of Oracle common stock further declined by $17.13 per share—more than 5.5%—from a close of $308.46 per share on September 24, 2025, to a close of $291.33 per share on September 25, 2025. *See* ¶¶ 223-25, *supra*.

333. Thus, over this two-day period, from close of market on September 23, 2025 ($313.83 per share) to the close of market on September 25, 2025 ($291.33 per share), Oracle stock declined by $22.50 per share.

**B. Second Partial Disclosures: December 10 And 11, 2025**

334. After the market closed on December 10, 2025, Oracle announced disappointing second quarter 2026 financial results, including revenue growth below analysts' consensus estimates, and negative FCF of approximately $10 billion. On the corresponding earnings call that evening, Defendant Kehring stated that Oracle now expected to spend an additional $15 billion on CapEx in 2026—on top of the previously announced $35 billion—bringing the total to approximately $50 billion. In addition, despite the increase in CapEx for FY26, Oracle held its FY26 revenue guidance at $67 billion. These disclosures stood in direct opposition to Defendants' prior statements that the Company's increased CapEx would lead to increased revenues "right away," as, for example, current revenues had disappointed and the increase in CapEx was not accompanied by any increased revenue projections.

335. Market analysts immediately expressed concern; for example, analysts at RBC Capital Markets and UBS revised their price targets for Oracle shares downwards significantly. That evening, Bloomberg reported that Oracle's credit risk had just reached a sixteen-year high.

336. Following these developments, Oracle shares declined substantially from their

price of $223.01 per share at market-close on December 10, 2025, to a closing price of $198.85 per share on December 11, 2025, a drop of $24.16. *See* ¶¶ 243-49, *supra*.

337. Continuing from there, after market close on December 11, 2025, Oracle announced $248 billion of additional lease commitments expected to commence as soon as Q3 FY26. (i.e., the current quarter). Analysts were stunned by this "bombshell disclosure." Oracle's $248 billion in lease commitments not only dwarfed those of the Big Three industry competitors, but the long duration of the leases was also at odds with the much shorter duration of the contracts that Oracle had announced; contracts Oracle cited as justifying its massive CapEx.

338. Contrary to Defendant Catz's previous statement that Oracle's swelling CapEx meant the Company was "buying components to build [] computers" to be put on the floor to meet demand (and thereby generate near-term revenue), investors learned that the Company was locked in to spending nearly $250 billion in cash on leases over the course of fifteen to nineteen years regardless of business needs, and further severely straining its cash position now and in the future. These developments further partially revealed that Oracle was not presently poised to provide sufficient infrastructure for generative AI customers, but rather, required significant additional development and increasing expenditures to deliver substantial revenues from its CapEx. *See* ¶¶ 250-54, *supra*.

339. Following this news, the price of Oracle common stock declined $8.88 per share from a close of $198.85 per share on December 11, 2025, to close at $189.97 per share on December 12, 2025.

340. Thus, over this two-day window in which information corrective of the alleged fraud entered the market, Oracle's common stock price fell by $33.04 per share, from a price of

$223.01 per share at the close of market on December 10, 2025 to a price of $189.97 per share at the close of market on December 12, 2025.

### C. Final Partial Disclosure: December 17, 2025

341. On December 17, 2025, before market open, the *Financial Times* reported that Blue Owl Capital—"the primary [financial] backer for Oracle's largest data centre projects in the US"—had backed out of funding a $10 billion Oracle data center intended to serve OpenAI. According to the report, Blue Owl pulled out of the deal as a result of concerns about Oracle's spending commitments and rising debt levels, the state of which were further compromised by the announcements Oracle made a week earlier. With this news, it became clearer that Oracle did not have the present capacity to provide sufficient infrastructure nor did it have the financial resources to get itself to a place where it could provide leading AI infrastructure services. Oracle's ability to generate accelerating revenues from these services was neither certain, nor coming "right away."

342. On this news, the price of Oracle common stock declined $10.19 per share, or approximately 5.4%, from a close of $188.65 per share on December 16, 2025, to close at $178.46 per share on December 17, 2025. *See* ¶¶ 256-59, *supra*.

343. Throughout the Class Period, including at the time of the foregoing corrective disclosures, Defendants mitigated the price declines of Oracle common stock by making additional false assurances concerning the alleged fraud, as alleged herein.

344. It was entirely foreseeable that Defendants' materially false or misleading statements and omissions of material fact alleged herein would artificially inflate and/or maintain the price of Oracle common stock and call options, and artificially deflate or maintain the artificial deflation of the price of Oracle put options. It was also foreseeable to Defendants that the disclosures of the previously misrepresented and/or concealed facts and materializations of the previously concealed risks would cause the price of Oracle's common stock to fall as the artificial

inflation caused or maintained by Defendants' misstatements and omissions was removed. The prices of Oracle call and put options rose and fell in correspondence with the movements of the Company's common stock price and for the same reasons. Thus, the price declines alleged above were directly and proximately caused by Defendants' materially false or misleading statements and omissions of material fact during the Class Period.

## X. CLASS ACTION ALLEGATIONS

345. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons and entities who, during the Class Period, purchased or otherwise acquired the publicly traded securities of Oracle, including persons and entities who purchased or otherwise acquired common stock and call options or who sold put options, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer, director, and/or control person of Oracle during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Oracle's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity, in their capacities as such.

346. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Throughout the Class Period, Oracle's common stock was actively traded on the NYSE, an open and efficient market, under the symbol "ORCL." As of July 14, 2026, there were more than 2.8 billion shares of Oracle common stock outstanding. Record owners and other Class members can be identified from records maintained by Oracle or its

transfer agent(s) and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

347. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

348. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

349. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (i) whether the Exchange Act was violated by Defendants' acts as alleged herein; (ii) whether statements made by Defendants to the investing public during the Class Period contained material misrepresentations and/or omitted to disclose material facts; (iii) whether and to what extent the market price of Oracle common stock and call options was artificially inflated or artificially maintained, and whether and to what extent the market price of Oracle put options was artificially deflated, during the Class Period due to the material misrepresentations and/or omissions alleged herein; (iv) whether Defendants acted with the requisite level of scienter; (v) whether the Individual Defendants were controlling persons of the Company; and (vi) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

350. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XI. A PRESUMPTION OF RELIANCE APPLIES

351. At all relevant times, the market for Oracle's securities was efficient as evidenced by the following facts, among others: (i) Oracle's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market; (ii) as a regulated issuer, Oracle filed periodic public reports with the SEC; (iii) Oracle regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and (iv) Oracle was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

352. As a result of the foregoing, the market for Oracle securities reasonably and promptly digested current information regarding Oracle from all publicly available sources and reflected such information in the prices of Oracle securities, including Oracle common stock, call options and put options. Under these circumstances, all purchasers and acquirers of Oracle common stock and call options at artificially inflated prices and all sellers of put options at artificially deflated prices during the Class Period suffered similar injury through their transactions in Oracle securities, and the presumption of reliance applies.

353. Further, at all relevant times, Plaintiff and other Class members relied on Defendants to timely disclose material information as required by law. Plaintiff and other Class

members would not have purchased or otherwise acquired Oracle common stock and call options at artificially inflated prices or sold put options at artificially deflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

354. The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein. Most, if not all, of the statements complained of herein were not forward-looking statements. Rather, they were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

355. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

356. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, or portion thereof, Defendants are liable for those false forward-looking

statements because at the time each of those statements was made, Defendants knew the statement was false and/or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XIII. CAUSES OF ACTION

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

357. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

358. Plaintiff asserts this Count on behalf of themself and all other members of the Class against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

359. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the Class; and (ii) cause Plaintiff and the Class to purchase or otherwise acquire Oracle common stock or call options at artificially inflated prices or sell put options at artificially deflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

360. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of Oracle common stock and call options and sellers of put options in an effort to maintain artificially high or deflated market prices thereof in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

361. During the Class Period, Defendants made the false statements specified above, which they knew or severely recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

362. Defendants had actual knowledge of the misrepresentations and omissions of material fact as set forth herein, or severely recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Oracle's true condition from the investing public and to support the artificially inflated prices of Oracle common stock and call options and artificially deflated prices of Oracle put options.

363. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired Oracle common stock and call options at inflated prices or sold put options at deflated prices. Plaintiff and the Class would not have purchased or otherwise acquired Oracle common stock and call options or sold put options at such prices, or at all, had they been aware that the market prices for Oracle common stock had been artificially inflated by Defendants' fraudulent course of conduct.

364. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases or acquisitions of Oracle common stock and call options and sales of put options during the Class Period. As alleged herein, when the true facts were subsequently disclosed, or the risks concealed by Defendants' public statements materialized, the price of Oracle's common stock declined precipitously, and Plaintiff and the other members of the Class were harmed and damaged as a direct and proximate result of their acquisitions of the Company's common stock and call options at artificially inflated prices or sale of put options at artificially deflated prices.

365. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

366. This claim is timely within the applicable statute of limitations and repose.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

367. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

368. Plaintiff asserts this Count on behalf of themself, and all other members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

369. The Individual Defendants acted as controlling persons of Oracle within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of Oracle, including the content and dissemination of the various false and/or misleading statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued or had the ability to prevent the issuance of the statements or cause the statements to be corrected.

370. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Oracle and, therefore, are presumed to have had the

power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

371. As described above, Oracle and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases or acquisitions of the Company's common stock and call options or sale of put options during the Class Period.

372. This claim is timely within the applicable statutes of limitations and repose.

## XIV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

D. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E. Granting such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 14, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Anthony M. Calvano*
Gregory V. Varallo (DE Bar ID #2242)
Anthony M. Calvano (DE Bar ID #6265)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3600
greg.varallo@blbglaw.com
anthony.calvano@blbglaw.com

*Liaison Counsel for Lead Plaintiff SEB Funds AB and Sparinvest S.A. and the Class*

*Of Counsel:*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Sharan Nirmul (DE Bar ID # 4589)
Jamie M. McCall (*pro hac vice*)
Joshua E. D'Ancona (*pro hac vice*)
Sarah T. Damiani (*pro hac vice*)
Lyndsey B. Campbell (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
jmccall@ktmc.com
jdancona@ktmc.com
sdamiani@ktmc.com
lcambell@ktmc.com

*Lead Counsel for Lead Plaintiff SEB Funds AB and Sparinvest S.A. and the Class*